# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
June 5, 2002 Session at Nashville

## STATE OF TENNESSEE v. GERALD POWERS

**Automatic Appeal from the Court of Criminal Appeals
Criminal Court for Shelby County
No. 96-08230-31     Joseph B. Dailey, Judge**

---

**No. W1999-02348-SC-DDT-DD - Filed January 6, 2003**

---

A Shelby County jury convicted the defendant, Gerald Powers, of first degree felony murder and aggravated robbery. He was sentenced to death for the felony murder charge and to a consecutive thirty-year prison sentence for the aggravated robbery charge. The Court of Criminal Appeals affirmed the conviction and death sentence for the felony murder but reduced Powers' sentence for the aggravated robbery to twenty years. Thereafter, the case was automatically docketed in this Court pursuant to Tennessee Code Annotated section 39-13-206(a)(1) (1997). We entered an order designating the following issues for oral argument:[1]  1) whether allowing Powers' wife to testify violated the confidential marital communications privilege in Tennessee Code Annotated section 24-1-201(b) (Supp. 1998); 2) whether the trial court erred in excluding evidence and restricting cross-examination indicating that other persons might have had the motive and opportunity to kill the victim; 3) whether the deposition of Margaret York was admissible; 4) whether the evidence was sufficient to establish beyond a reasonable doubt the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(6) (Supp. 1996); 5) whether the facts underlying Powers' prior violent felony convictions were admissible; 6) whether the trial court erred in not allowing the defense to attack the character of the victim at the sentencing hearing; and 7) whether the sentence of death is disproportionate, and all other issues mandated by Tennessee Code Annotated section 39-13-206(c)(1) (1997). Having carefully reviewed these issues and the issue of identification testimony raised by Powers, we find no merit to his arguments. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument . . . ." Tenn. R. Sup. Ct. 12.2.

JANICE M. HOLDER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, JJ., joined. WILLIAM M. BARKER, J., filed a dissenting opinion, in which ADOLPHO A. BIRCH, JR., J., joined.

W. Mark Ward, Tony N. Brayton, and Garland Ergüden, Memphis, Tennessee, for the appellant, Gerald Powers.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Alice B. Lustre, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

On April 18, 1996, the victim, Shannon Sanderson, spent the evening gambling at Sam's Town Hotel and Gambling Hall in Tunica, Mississippi. She originally planned to spend her evening at the casino with her husband, Robert Sanderson, to celebrate his birthday. However, an argument occurred between the couple. After leaving her children with their paternal grandparents at approximately 6:30 p.m., Mrs. Sanderson departed for Tunica alone.

Shannon Sanderson played blackjack most of the night and won $5,000. She cashed in her chips shortly after 3:00 a.m. on April 19, 1996, receiving her winnings in one-hundred dollar bills. She was then escorted to her car by a Sam's Town security officer and began the fifty-six mile drive back to Memphis to pick up her children.

At around 4:45 a.m., Shannon Sanderson's former father-in-law, Edward Holland, awoke to the sound of barking dogs. He looked outside and saw Mrs. Sanderson bending over beside her car. He heard her say, "Don't-don't" and thought she was talking to her husband. By the time Mr. Holland dressed and went outside, Mrs. Sanderson was gone, but her car remained in the driveway.

At the same time, the Hollands' next-door neighbors, William and Anna Dillon, were also awakened by the barking. Mr. Dillon looked out his window and saw a person wearing a red baseball cap crouched in the Hollands' driveway near Mrs. Sanderson's car. Mrs. Dillon heard a scream and a thud. When she looked out her living room window, she saw a car parked at the curb with its dome light on. She saw a person behind the steering wheel of the car lean over the seat and push something down in the back. The person then drove away at a high rate of speed.

Another neighbor, Johnnie Rose, was returning from work around 4:30 a.m. when he saw Mrs. Sanderson's car drive by his house. A second vehicle followed her. The vehicle was dark-colored and shaped like a Chevrolet Beretta. He watched the second car turn down his street, turn around in a driveway, and park in front of the Hollands' house. When he was later shown a photograph of the maroon Beretta owned by Powers' wife, he stated that the car in the photograph "looked like" the car he had seen following Mrs. Sanderson.

2

At approximately 6:40 a.m. on April 19, 1996, Alonzo Jeans, a school bus driver, was heading north on Highway 301 near Eudora, Mississippi. He saw a white male backing into the driveway of an abandoned house. In the ten years he had been driving this bus route, he had never seen anyone coming from or going to that house. Mr. Jeans was later shown a photograph of the maroon Beretta owned by Powers' wife. He confirmed that the car in the photograph was the one he had seen in the driveway.

At approximately 9:30 a.m. on April 19, 1996, Powers returned to his Clarksdale, Mississippi home in his wife's maroon Beretta, after a night of gambling in Tunica. He was wearing the same yellow shirt, blue jeans, red baseball cap, blue denim jacket, and white tennis shoes that he had worn the night before. According to his wife, Sharon Powers, he was in a good mood, but he was also "kind of wired up." He appeared nervous and kept looking out the blinds. Powers told his wife that he had won a large amount of money at the casino and gave her a one-hundred dollar bill from the stack he had in his wallet. Mrs. Powers also noticed that her husband had washed her car and had cleaned and vacuumed its interior.

Mrs. Powers became suspicious and accused her husband of having an affair. After repeated questioning, Powers confessed to kidnapping, robbing, and killing a woman he had seen playing blackjack at Sam's Town the night before. He described in specific detail how he watched the woman play blackjack from the second floor balcony of the casino, followed her home, and abducted her from her driveway. He drove her approximately forty miles to an abandoned house in Mississippi, stopping at one point to move her from the back seat of the car to the trunk. He then stole her jewelry as well as $5,000 in cash. After killing the woman, he threw her purse and his gun into the river behind the site where the Splash Casino had been located. Powers also told his wife that a school bus driver may have seen him at the abandoned house and that a neighbor may have seen him take Mrs. Sanderson from her driveway. He did not believe that either person could identify him.

That afternoon, Powers visited his neighbor, Margaret York, and asked her to provide him with an alibi for the night of April 18, 1996. Laughing, Ms. York agreed to say that he had been with her as long as he "didn't kill anybody." According to Ms. York, Powers' expression did not change when she made this remark, and he left shortly thereafter.

The next evening, Powers and his wife saw a television news report of the victim's abduction. The report described the perpetrator as a man wearing a red baseball cap and driving a maroon Beretta. After hearing the report, Powers packed a bag and left home in his wife's car. Before leaving, he told his wife to tell anyone who asked that he was visiting his mother in Murfreesboro, Tennessee. He also told his wife that there was some money buried in the backyard. Soon after he left, Mrs. Powers called the police and told them that her husband may have been involved in Mrs. Sanderson's abduction. However, she did not inform the authorities about his confession.

Powers returned a week later. He retrieved some of the money he had buried and told his wife where he had hidden Mrs. Sanderson's jewelry. As his wife watched, he wrote a note stating that he was leaving because he was not happy with his marriage.

On May 9, 1996, the badly decomposed body of Shannon Sanderson was discovered in a storage room at the back of the abandoned house on Highway 301 in Eudora, Mississippi. The body was clad in the same clothing Mrs. Sanderson had been wearing the night she disappeared. Her jewelry was missing. An autopsy disclosed that Mrs. Sanderson had died from a single gunshot wound to the right side of the head. An examination of the skull revealed that she had also suffered at least one major blow to her face that had knocked out her upper right front tooth, chipped another tooth, and fractured her jaw and other facial bones.

On May 22, 1996, Powers was stopped by an Immigration and Naturalization Services ("INS") agent in Hebronville, Texas, after making a suspicious turn in an apparent attempt to avoid a checkpoint. When ordered to step out of the vehicle, Powers pulled a knife on the agent. The agent was able to subdue Powers. Upon arrest, the agent discovered fourteen one-hundred dollar bills in Powers' pockets. Powers was on parole for a prior offense at the time of his arrest.

The Federal Bureau of Investigation ("FBI") secured the vehicle at the checkpoint and learned that Sharon Powers was its registered owner. With Mrs. Powers' consent, the FBI searched the Beretta and found a black wool fiber in the back seat that was consistent with the victim's clothing. Subsequently, the FBI interviewed Mrs. Powers. She eventually informed investigators of her husband's confession and led them to the B & W Lounge where Mrs. Sanderson's jewelry was recovered. The jewelry was wrapped in pink plastic wrap that matched wrap from Powers' home. Officers also searched the Splash Casino site, but they did not find Mrs. Sanderson's purse or the murder weapon.

The State also introduced video clips chronologically compiled from Sam's Town surveillance cameras operating on the night and early morning hours of April 18-19, 1996. The videotape showed a person wearing white tennis shoes standing in an area overlooking the blackjack table where Mrs. Sanderson was gambling. The tape then recorded Mrs. Sanderson leaving the casino. The person from the second floor balcony followed her approximately thirty seconds later.

Powers called only one witness, Rebecca Coradini, who lived near the Holland residence. Ms. Coradini testified that she was standing on her front porch shortly after 4:00 a.m. on April 19, 1996, when she saw a van drive by, turn around, and come back. She then saw Mrs. Sanderson's car drive by, followed by a little maroon car driven by an older Caucasian man, who resembled the victim's husband. Ms. Coradini had seen Mr. Sanderson on television following the abduction.

At the conclusion of the evidence, the jury convicted Powers of aggravated robbery and first degree felony murder in the perpetration of robbery. During the sentencing phase of the trial, the State sought to prove three aggravating circumstances: 1) the defendant had been previously convicted of one or more felonies wherein the statutory elements involve the use of violence to the person; 2) the murder was committed for the purpose of avoiding, interfering with, or preventing a

4

lawful arrest or prosecution; and 3) the murder was knowingly committed, solicited, directed, or aided by the defendant while he was committing, attempting to commit, or fleeing after having committed a kidnapping. See Tenn. Code Ann. § 39-13-204(i)(2), (6), and (7) (Supp. 1996).

The State presented, over defense counsel's objection, facts relating to Powers' prior felony convictions. First, Emily Dodson testified that in 1979, in Rutherford County, Tennessee, Powers followed her home one night. As she was getting out of the car, Powers jumped into the car and held a knife to her throat. They struggled, and Powers hit her with a crescent wrench. Ms. Dodson, however, successfully escaped to her house. Powers was apprehended shortly thereafter, and Ms. Dodson identified him as her attacker. Powers subsequently pleaded guilty to the aggravated assault of Ms. Dodson.

Karen Cannon then testified that in October 1980, in Murfreesboro, Tennessee, she was giving Powers a ride when he pulled a knife and broke her nose with the handle. Despite being held at knifepoint, Ms. Cannon managed to drive to the county jail where she alerted the authorities to her predicament by honking the horn. Powers was apprehended, and Ms. Cannon later identified him as her assailant. Powers subsequently pleaded guilty to the aggravated assault of Ms. Cannon.

The State next introduced testimony of Captain Sammy Magee, an officer with the Sheriff's Office of Hinds County, Mississippi. Captain Magee testified about his investigation of Powers' robbery and aggravated assault of Clyo Griffin in June 1984. According to Captain Magee, Powers entered Ms. Griffin's home, beat her with an iron skillet, and stole her jewelry, credit cards, and a pistol. Powers hid the jewelry and pistol in a plastic bag and buried them. He later pleaded guilty to robbery and aggravated assault of Ms. Griffin.

The State also introduced a copy of the judgment reflecting Powers' guilty plea and conviction for assault with a dangerous weapon on the INS agent in Hebronville, Texas, in May 1996.

Finally, the State introduced the victim impact testimony of Caroline Holland, the paternal grandmother of Shannon Sanderson's three children. Ms. Holland testified that the death of Mrs. Sanderson had been very traumatic for the children and that they suffered a "devastating feeling of terror" that people would get lost and never come back. She also stated that the children had trouble sleeping and missed their mother every day.

The only witness for the defense was Powers' first wife, Pamela Bigelow, who had married him while they were seniors in high school in Murfreesboro, Tennessee. Ms. Bigelow related that Powers came to the United States from Taiwan when he was ten years old. Powers' mother was a native of Taiwan. His stepfather was a resident of Murfreesboro, Tennessee, who had met Powers' mother while stationed with the military in Taiwan. According to Ms. Bigelow, Powers was a good student and athlete, but he had trouble communicating with his mother. Ms. Bigelow and Powers were married for four years and had two children. She divorced Powers because she "outgrew him," but she stated that Powers possessed "good traits." She described Powers as quiet and withdrawn, but very polite. She testified that Powers had never been physically or emotionally abusive to her.

5

She admitted, however, that he had used drugs and alcohol while they were married. She described Powers as a "broken man" and pleaded for his life so that he could meet his two grandchildren.

Based on this proof, the jury found that the State had proven all three aggravating circumstances beyond a reasonable doubt. In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced Powers to death for the murder of Shannon Sanderson.

CONFIDENTIAL MARITAL COMMUNICATIONS PRIVILEGE

At the time of trial, the statutory marital privilege codified at Tennessee Code Annotated section 24-1-201(b) provided in relevant part that "[i]n either a civil or criminal proceeding, confidential communications between married persons are privileged and inadmissible if either spouse objects." Powers contends that his wife's testimony concerning his confidential communications should have been excluded under the statute. Specifically, he argues that the General Assembly's amendment of this statute in 1995 returned the law to its status before this Court's opinion in State v. Hurley, 876 S.W.2d 57 (Tenn. 1993), and made inappropriate the use of the factors adopted in Adams v. State, 563 S.W.2d 804, 808 (Tenn. Crim. App. 1978). We do not agree.

Under early common law, one spouse was not permitted to testify either for or against the other during court proceedings. This general rule was referred to as "spousal disqualification." Trammel v. United States, 445 U.S. 40, 43-44 (1980). This Court abandoned the spousal disqualification rule in civil cases in Patton v. Wilson, 70 Tenn. (2 Lea) 101, 112-13 (1878). We held that a wife was competent to testify in support of her deceased husband's estate as to matters that came to her knowledge from sources outside the marital relationship. See id. One year later, the Tennessee General Assembly codified the holding of Patton and established the confidential marital communications privilege, stating that

> [i]n all civil actions, no person shall be incompetent to testify because he is a party to, or interested in, the issue tried . . . but all persons, including husband and wife, shall be competent witnesses, *though neither husband nor wife shall testify as to any matter that occurred between them by virtue of or in consequence of the marital relation . . . .*

1879 Tenn. Pub. Acts, ch. 200, § 1 (codified at Tenn. Code Ann. § 24-1-201 (1991))(emphasis added). Spousal disqualification in criminal cases was abolished by the legislature in 1915. See 1915 Tenn. Pub. Acts, ch. 161, § 1 (later codified at Tenn. Code Ann. § 40-17-104 (1990)(repealed 1991) and recognized by the adoption of Tenn. R. Evid. 501). Unlike its civil counterpart, however, the statute abolishing spousal disqualification in criminal cases failed to address the confidential marital communications privilege. This Court, however, expressly held that this omission did not abrogate the rule as to the marital communications privilege. Consequently, the privilege applied to both civil and criminal cases, preventing a spouse from testifying as to any matter coming to his

or her knowledge by reason of the marital relation.  See McCormick v. State, 186 S.W. 95, 97 (Tenn. 1916).

Over time, the confidential marital communications privilege remained intact, but underwent revisions that operated to limit the privilege.[2]  In Adams, the Court of Criminal Appeals held that the following conditions must exist before a communication may be considered privileged:

> (1)    The communications must originate in a confidence that they will not be disclosed;
>
> (2)    This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties;
>
> (3)    The relation must be one which, in the opinion of the community, ought to be sedulously fostered; and
>
> (4)    The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.

563 S.W.2d at 808.

In Hurley, this Court endorsed the application of the four Adams factors to determine whether a marital communication is privileged.  876 S.W.2d at 63.  We also modified the common law rule that allowed both parties to assert the privilege.  We held that the witness spouse alone could assert the confidential marital communications privilege.  See id. at 64.

In 1995, in response to Hurley, the General Assembly amended Tennessee Code Annotated section 24-1-201.  The new version of the statute provided:

> (a)    In either a civil *or criminal* proceeding, no married person has privilege to refuse to take the witness stand solely because that person's spouse is a party to the proceeding.
>
> (b)    In either a civil *or criminal* proceeding, *confidential communications between married persons are privileged and inadmissible if either spouse objects*.  This communications privilege shall not apply to proceedings between spouses or to proceedings concerning abuse of one (1) of the spouses or

---

[2] For instance, the legislature added an express exception for divorce cases, see 1949 Tenn. Pub. Acts, ch. 55, § 1, and this Court clarified that the privilege only applied to communications made between spouses in the absence of third persons, see Hazlett v. Bryant, 241 S.W.2d 121, 123 (Tenn. 1951).

> abuse of a minor in the custody of or under the dominion and
> control of either spouse . . . .

1995 Tenn. Pub. Acts, ch. 53, § 1 (emphasis added). This version of Tennessee Code Annotated section 24-1-201 was in effect at the time of the offense in this case as well as at the time of Powers' trial. Powers asserts that the trial court and Court of Criminal Appeals erred by applying the Adams factors to determine whether his communications were privileged. He argues that the revised statute effectively abrogated the applicability of the four criteria because the statute made no mention of them. We disagree.

The role of this Court in construing statutes is to ascertain and give effect to the legislative purpose and intent without unduly restricting or expanding the coverage of the statute beyond its intended scope. See Mooney v. Sneed, 30 S.W.3d 304, 306 (Tenn. 2000). The best expression of the legislative purpose and intent is "the natural and ordinary meaning of the language used by the Legislature within the four corners of the statute . . . ." Austin v. Memphis Publ'g Co., 655 S.W.2d 146, 148 (Tenn. 1983). Only an ambiguity in the language of the statute will permit us to look behind its face to determine the legislature's intent. See id. A statute is ambiguous "[w]here [the] language . . . is susceptible of more than one reasonable interpretation . . . ." Memphis Hous. Auth. v. Thompson, 38 S.W.3d 504, 512 (Tenn. 2001) (citing Carter v. State, 952 S.W.2d 417, 419 (Tenn. 1997)).

We agree with Powers' contention that the language of the statute clearly indicates the General Assembly's intent to return the law to its pre-Hurley status. It is clear that the amended statute expressly overturns the rule in Hurley that vested the privilege solely in the testifying spouse and provides that either spouse may assert the privilege. However, it is not clear that the legislature intended to abolish the Adams factors. We conclude that the legislature had no such intent.[3]

In 2000, the General Assembly amended Tennessee Code Annotated section 24-1-201 to adopt the Adams factors. Powers claims that this amendment would not have been necessary had the legislature intended the 1995 amendment to include the Adams factors. Powers argues that the factors were not implicit in the 1995 statute because a change in the language of a statute by the legislature raises a presumption that the legislature intended to depart from the old law. See Dunn v. Hackett, 833 S.W.2d 78, 81 (Tenn. Ct. App. 1992). Powers also relies on the rule that one must presume that the legislature did not enact useless or meaningless legislation. See Tex. Gas Transmission Corp. v. Atkins, 327 S.W.2d 305, 307 (Tenn. 1959). However, we find this argument unconvincing.

---

[3] By adopting the opinion of the Court of Criminal Appeals in an appendix to our opinion in State v. Bush, 942 S.W.2d 489, 509 (Tenn. 1997), we recognized that the common law prior to Hurley included the use of the Adams factors. The Court of Criminal Appeals has consistently followed this interpretation. See State v. Gosnell, 62 S.W.3d 740, 746-47 (Tenn. Crim. App. 2001) (stating that even prior to the 2000 amendment, which explicitly adopted the Adams factors, the confidential marital communications privilege was available only when the factors were met); State v. Price, 46 S.W.3d 785, 799-800 (Tenn. Crim. App. 2000) (concluding that the General Assembly did not intend to change the common law beyond reversing the rule in Hurley that exclusively vested the privilege in the testifying spouse).

By adding the Adams factors to the statute, the legislature was codifying twenty-two years of case law.[4] The Adams factors define the confidential marital communications privilege. The 1995 amendment showed no clear intent on the part of the legislature to alter that definition. The statute does not define "confidential," "communications," or "privileged." Therefore, the meaning of those terms must be provided by the existing case law, including Adams. The legislature is presumed to know the state of existing case law. See Neff v. Cherokee Ins. Co., 704 S.W.2d 1, 4 (Tenn. 1986). Thus, it would have been necessary for the General Assembly to explicitly abolish the Adams factors if that had been its intent. See Price, 46 S.W.3d at 801(stating that a "statute is to be construed with reference to pre-existing law and it does not change pre-existing law further than it expressly declares or necessarily implies"). The 1995 statute, however, fails to mention the factors at all.

Based on our interpretation of the 1995 amendment of Tennessee Code Annotated section 24-1-201, we find that the General Assembly did not intend to abrogate the applicability of the Adams factors. We conclude that the intent of the General Assembly in its 2000 amendment of the statute was to codify existing common law. Therefore, we hold that the trial court did not err in applying the Adams factors to determine whether Powers' communications with his wife were privileged. Moreover, the record supports the trial court's findings regarding the application of the factors to the facts in this case. Consequently, the confidential marital communications privilege did not apply, and Sharon Powers' testimony was admissible.

### EXCLUSION OF EVIDENCE THAT OTHER PERSONS HAD MOTIVE AND OPPORTUNITY TO KILL THE VICTIM

Powers challenges the trial court's exclusion of evidence suggesting that persons other than himself had motive and opportunity to kill Shannon Sanderson. He asserts that the trial court's exclusion of this evidence on irrelevancy grounds effectively deprived him of his Fourteenth Amendment right to be afforded a meaningful opportunity to present a complete defense. Specifically, he contends that the following evidence would have established a third-party defense and should have been admitted: 1) testimony that the victim had broken off a romantic relationship with Brian Maher two days before she disappeared; 2) testimony concerning an injunction entered against a former boyfriend, Brett Musekamp, that was lifted just before the victim disappeared; 3) cross-examination of Robert Sanderson regarding the existence of a post-nuptial agreement executed by him and the victim two weeks before the victim's disappearance; 4) testimony from Sam's Town assistant manager Mark Burchfield that he saw the victim and her husband together at the casino the night she disappeared and that the victim appeared to be fearful of her husband; and 5) testimony from Mr. Burchfield that Robert Sanderson came to the casino three days after the victim's

---

[4] The dissent argues that legislative history indicates that the 2000 amendment represented a material change in the law. We find it unnecessary to resort to legislative history to ascertain the legislature's intent. Nevertheless, we note that the bill's sponsor stated that the amendment "adopts the case-law standard that has four specific factors that have to be considered by the court." Legislative Tapes on House Bill 1559, Senate Bill 1485, 101st General Assembly (Second Regular Session) (Tenn. 2000) (statement by Rep. Kim McMillan, House Judiciary Committee, May 3, 2000).

disappearance to discuss her disappearance and to tell Mr. Burchfield that he was not at the casino on April 18, 1996.[5]

It has long been recognized by the courts of this state that an accused is entitled to present evidence implicating others in the crime. See Sawyers v. State, 83 Tenn. (15 Lea) 694, 695 (1885). However, a clear standard for the admission of such evidence has never been articulated. A majority of states apply a "direct connection" test in making this determination. Under a "direct connection" test, the evidence must directly connect the third party with the substance of the crime and must clearly point out someone besides the accused as the guilty person in order to be admissible.[6] We believe, however, that such a standard imposes too high a threshold for the admissibility of evidence concerning third-party culpability.[7] We hold that the Rules of Evidence are adequate to determine whether such evidence is admissible.

To be relevant under Tennessee Rule of Evidence 401, evidence must tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In a criminal case, evidence that a third party had the motive and opportunity to commit the offense certainly would be relevant. Even if the evidence meets the test of relevance, however, Tennessee Rule of Evidence 403 may still justify exclusion of such evidence. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Generally, when we review a claim that calls into question a trial court's exclusion of evidence on the grounds of irrelevance, we will not disturb the decision of the trial court absent an abuse of discretion. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978).

Powers sought to prove that three other persons had motives to kill Mrs. Sanderson: Brian Maher, Brett Musekamp, and Robert Sanderson. Powers attempted to introduce evidence that Mrs. Sanderson and Mr. Maher had dated for approximately two months. Just two days before her disappearance she went to Mr. Maher's place of employment to break off the relationship. She then telephoned him two hours later to confirm that they were "still friends." Mr. Maher would have testified that he was relieved when Mrs. Sanderson decided to end the relationship because he had started seeing another woman. There was no evidence of animosity between the parties that would

---

[5] In his brief, Powers also asserts that the trial court erred by excluding testimony from Mrs. Sanderson's sister that Robert Sanderson refused to provide her with a photograph of the victim to use in a missing person flyer. Because Powers failed to make an offer of proof as to this testimony, this issue is waived. See Tenn. R. App. P. 36(a); see also State v. Elderidge, 951 S.W.2d 775, 783-84 (Tenn. Crim. App. 1997).

[6] See generally David McCord, But Perry Mason Made It Look So Easy!: The Admissibility of Evidence Offered by a Criminal Defendant to Suggest That Someone Else Is Guilty, 63 Tenn. L. Rev. 917 (1996).

[7] The Court of Criminal Appeals has applied a "direct connection" test in two unpublished opinions. See State v. Moore, No. 03C01-9704-CR-00131, 1998 WL 156908 (Tenn. Crim. App. Mar. 18, 1998); State v. Peck, No. 958, 1991 WL 154534 (Tenn. Crim. App. Aug. 15, 1991). Citing Peck, the Court of Criminal Appeals concluded in this case that the proffered evidence was irrelevant and inadmissible because Powers offered no proof which directly connected a third party with the substance of the crime.

give rise to a motive to kill the victim. The trial court found the evidence relating to Mr. Maher to be irrelevant and refused to admit it. We agree with the trial court that the evidence was not relevant under Tennessee Rule of Evidence 401. The evidence produced in Powers' offer of proof would not assist in proving that Mr. Maher had a motive to kill Mrs. Sanderson. We conclude that the trial court did not err in excluding the evidence concerning Brian Maher.

Powers also proffered testimony regarding an injunction against Brett Musekamp that was lifted shortly before Mrs. Sanderson disappeared. Mr. Musekamp would have testified that he had written a letter to Mr. Sanderson in an attempt to stop the Sandersons from dating. Mr. Musekamp stated that the letter angered the Sandersons and that they brought charges against him to keep him away from Mrs. Sanderson. He denied ever following or threatening Mrs. Sanderson. The trial court also excluded this evidence on relevancy grounds. We agree that this evidence was irrelevant under Tennessee Rule of Evidence 401. The mere existence of Mr. Musekamp's attempt to undermine the Sandersons' relationship is not relevant to establish a motive to kill Mrs. Sanderson. Therefore, we conclude that the trial court did not abuse its discretion in excluding the evidence concerning Brett Musekamp.

Powers also sought to cross-examine Mr. Sanderson about a post-nuptial agreement that was executed by him and Mrs. Sanderson. Under the agreement, the parties planned to file joint income tax returns for 1995, 1996, and 1997. In the event of a divorce, each party would retain his or her separate, personal property, and Mrs. Sanderson would receive $10,000. In addition, Mr. Sanderson would be obligated to rent an apartment for Mrs. Sanderson for a period of sixty days. The agreement was to be a final settlement of any divorce action unless the parties gave birth to a child. The trial court ruled that the evidence was irrelevant. We hold that the trial court did not abuse its discretion in excluding this evidence. Mr. Sanderson testified that neither he nor Mrs. Sanderson were contemplating divorce, and the existence of the agreement does not necessarily lead to the conclusion that the Sandersons were having marital problems. There is no indication that the terms of the agreement were disadvantageous to Mr. Sanderson or that he considered them to be so. Consequently, even if this evidence satisfies the relatively low threshold of Tennessee Rule of Evidence 401, its probative value would be substantially outweighed by the risk of confusing and misleading the jury. Therefore, we conclude that the trial court did not err in refusing to admit this evidence.

However, we reach a different conclusion with regard to the other testimony concerning Robert Sanderson. Rebecca Coradini testified that Mr. Sanderson looked like the man she saw following Mrs. Sanderson into the Hollands' neighborhood on the morning of April 19, 1996. In addition to this testimony, Powers proffered the testimony of Mark Burchfield, an assistant shift manager at Sam's Town. Mr. Burchfield would have testified that he saw Mrs. Sanderson on the night of Mrs. Sanderson's disappearance as she was attempting to hide in a restricted area of the casino. Mr. Burchfield observed that Mrs. Sanderson was shaking. Mrs. Sanderson explained that she was having trouble with a man at the blackjack table and that the man was her husband. Ultimately, Mrs. Sanderson identified her husband to Mr. Burchfield. Mr. Burchfield also would have testified that three days later Mr. Sanderson returned to the casino, asked for him by name, and introduced himself. Mr. Sanderson asked Mr. Burchfield what Mrs. Sanderson had said about him.

Mr. Sanderson then stated to Mr. Burchfield that Mr. Sanderson had not been there on the night in question. That testimony, if admitted into evidence, would have been in direct contradiction to Mr. Sanderson's testimony that his wife was alone at the casino that night. The proffered testimony of Mr. Burchfield was relevant to show that Mr. Sanderson had the motive and the opportunity to kill Mrs. Sanderson. Considering Ms. Coradini's testimony, the probative value of Mr. Burchfield's testimony concerning Mr. Sanderson was not substantially outweighed by the risk of unfair prejudice, confusion of issues, possible misleading of the jury, or waste of time. The jury was entitled to hear this evidence, weigh it, and determine its value. We conclude, therefore, that the trial court erred by not permitting the jury to consider this evidence. However, we must now determine whether this error warrants reversal of Powers' conviction.

To make this determination, we must first decide whether the error complained of is a constitutional or non-constitutional error. See State v. Harris, 989 S.W.2d 307, 314 (Tenn. 1999). If the error is constitutional, the burden shifts to the State to prove harmlessness, and the error will result in reversal unless this Court is convinced beyond a reasonable doubt that the error did not affect the outcome of the trial. See id. at 314-15. On the other hand, if the error is non-constitutional, the burden does not shift to the State, and the error will not result in reversal "unless the error affirmatively appears to have affected the result of the trial on the merits, or considering the whole record, the error involves a substantial right which more probably than not affected the judgment or would result in prejudice to the judicial process." Id. at 315.

Powers claims that the trial court's exclusion of evidence that supported his third-party defense effectively deprived him of his Fourteenth Amendment right to be afforded a meaningful opportunity to present a complete defense. Such a right has been deemed a fundamental element of due process. See Washington v. Texas, 388 U.S. 14, 22-23 (1967). When an error affects a constitutional right, it is considered constitutional error and is presumed to be reversible. See Harris, 989 S.W.2d at 315.

However, an evidentiary ruling ordinarily does not rise to the level of a constitutional violation. See Crane v. Kentucky, 476 U.S. 683, 689 (1986) ("We acknowledge also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."). As we explained in State v. Brown, 29 S.W.3d 427, 433 (Tenn. 2000), "[t]he facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence." In determining whether the constitutional right to present a defense has been violated by the exclusion of evidence, the analysis should consider whether: "1) the excluded evidence is critical to the defense; 2) the evidence bears sufficient indicia of reliability; and 3) the interest supporting exclusion of the evidence is substantially important." Id. at 433-34 (citing Chambers v. Mississippi, 410 U.S. 284, 298-301 (1973)). In Chambers, the defendant was not allowed to introduce evidence that another person had confessed to the crime. Powers' proffered evidence concerning Robert Sanderson falls short of the critical evidence considered in Chambers. Moreover, the trial court's ruling did not amount to a "blanket exclusion" of all third-party defense evidence concerning Robert Sanderson. See Crane, 476 U.S. at 690 (holding that blanket exclusion of proffered testimony about circumstances of petitioner's confession deprived him of a fair trial).

12

On the facts of this case, we cannot conclude that the trial court's erroneous exclusion of additional evidence concerning Robert Sanderson amounted to a due process violation.

We are convinced that the error was harmless, even if a constitutional harmless error standard were applicable. See id. at 691 (stating that a defendant's right to be afforded a meaningful opportunity to present a complete defense is subject to harmless error analysis). There was overwhelming evidence establishing Powers' guilt, including his confession and his knowledge concerning the location of Mrs. Sanderson's jewelry. Therefore, Powers' conviction will not be reversed on this ground.

ADMISSION OF DEPOSITION TESTIMONY OF MARGARET YORK

Powers maintains that the trial court erred in allowing the State to admit into evidence portions of Margaret York's deposition, which was taken by a Tennessee court reporter in Mississippi. He claims that the deposition testimony should have been excluded because the court reporter was not authorized by law to take the deposition in Mississippi. Based upon the discussions held prior to the deposition and the clear need to take the deposition in Mississippi due to Ms. York's medical condition, the trial court ruled that it could "be fairly interpreted that the court reporter that went down with all of you to take this deposition in Mississippi was appointed indirectly by [the court]." For the reasons set forth below, we find that the trial court did not err in admitting Ms. York's deposition testimony.

Under Rule 15(d) of the Tennessee Rules of Criminal Procedure, depositions in criminal cases "shall be taken and filed in the manner provided in civil actions except as otherwise provided in these rules." Rule 28.01 of the Tennessee Rules of Civil Procedure, which addresses the taking of depositions, states that

> [w]ithin the United States . . . depositions shall be taken before an officer authorized to administer oaths by the laws of the United States or of the place where the examination is held, or before a person appointed by the court in which the action is pending. A person so appointed has power to administer oaths and take testimony.

Before the deposition was taken, the trial judge discussed with counsel the need to have someone present at the deposition to administer the oath. After determining that it would be inappropriate for the judge himself to travel to Mississippi for this purpose, the trial judge specifically mentioned that someone else would need to be sent. The deposition was then taken in Mississippi by a Tennessee court reporter. At the hearing held May 15, 1998, counsel first raised the issue of the admissibility of the deposition. The trial judge stated that "it was [his] intent . . . acting in good faith to have someone chosen, selected, appointed to go down there who could take the deposition and who could administer the oath." In light of the discussions and planning that led up to Ms. York's deposition and the clear need to conduct the deposition in Mississippi, we agree with the trial court's assessment that the court effectively appointed the court reporter under Tennessee Rule of Civil Procedure 28.01.

13

Moreover, it appears that the court reporter was authorized to take the deposition in Mississippi. Under Mississippi law in effect at the time the deposition was taken, authorized notaries of other states were permitted to administer oaths in Mississippi. Mississippi Code Annotated section 11-1-1 provides, in pertinent part, that

> any officer of any other state, or of the United States, authorized by the law thereof to administer oaths . . . may administer oaths and take and certify affidavits whenever the same may be necessary or proper in a proceeding in any court or under any law of this state, or for the purpose of taking depositions of any party of interest, or witnesses of any suit pending before any such court, or for the perpetration of testimony, as provided in Section 13-1-57, Mississippi Code of 1972.

As a notary authorized to administer oaths under Tennessee Code Annotated section 8-16-302,[8] the court reporter was authorized to administer oaths in Mississippi. Thus, the trial court properly admitted Ms. York's deposition testimony.

### SUFFICIENCY OF EVIDENCE ESTABLISHING THE AGGRAVATING CIRCUMSTANCE IN TENNESSEE CODE ANNOTATED SECTION 39-13-204(i)(6)

Powers contends that the evidence presented by the State was insufficient under the standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979), to establish beyond a reasonable doubt the aggravating circumstance found at Tennessee Code Annotated section 39-13-204(i)(6). Section 39-13-204(i)(6) provides that the death penalty may be imposed if "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another . . . ." Under the Jackson standard, an appellate court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the [aggravating circumstance] beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original); see also Tenn. Code Ann. § 39-13-204(i) (Supp. 1996). While the State agrees with the application of this standard, it argues that the record amply supports the jury's finding that one of the motives for the murder was to avoid arrest or prosecution. We find that the evidence presented was sufficient to establish the (i)(6) aggravator.

In proving the (i)(6) aggravator, the State does not need to prove that the defendant's desire to avoid arrest or prosecution was his sole motive in murdering the victim. See State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000). It must show only that such a desire was "one of the motives in the killing." Id. However, we have indicated that there must be some "particular proof" in the record to support this aggravating circumstance. State v. Hartman, 42 S.W.2d 44, 58 (Tenn. 2001). Mere plausibility of the theory that avoiding arrest or prosecution was one of the motives of the murder is insufficient. See id.

---

[8] Tennessee Code Annotated section 8-16-302 provides that "[a] notary public has the power to administer oaths, to take depositions, to qualify parties to bills in chancery, and to take affidavits, in all cases . . . ."

In the present case, Powers followed Mrs. Sanderson over fifty miles to Memphis, where he abducted her from the Hollands' driveway. Realizing that one of the Hollands' neighbors may have seen him take Mrs. Sanderson, he began the forty-mile drive back to Mississippi, stopping at one point to move her from the backseat of the car to the trunk. He took her to an abandoned house in a rural part of Mississippi. He shot her in the head, robbed her of her money and jewelry, and left her body in a storage room. If he had not been concerned about avoiding arrest and prosecution, he could have killed Mrs. Sanderson in the driveway. However, he took her to another state and killed her in an abandoned house located in an isolated, rural area. We conclude that this evidence, viewed in a light most favorable to the State, supports a finding that Powers killed Mrs. Sanderson to avoid arrest and prosecution.

## ADMISSION OF FACTS UNDERLYING
## DEFENDANT'S PRIOR FELONY CONVICTIONS

Powers argues that the trial court erred during the sentencing hearing by admitting evidence of the facts underlying his prior felony convictions of three aggravated assaults and a robbery to prove the (i)(2) aggravating circumstance. Specifically, he claims that the trial court improperly applied the 1998 amendment to Tennessee Code Annotated 39-13-204(c) in determining whether to admit this evidence.[9] The record indicates that Powers objected at trial to the admissibility of the facts underlying his prior convictions based on the cumulative and prejudicial nature of the evidence. He did not, however, object to the applicability of the 1998 amendment. Generally, a party's failure to take available action to prevent or nullify an alleged error waives the issue. See Tenn. R. App. P. 36(a); see also State v. Elderidge, 951 S.W.2d 775, 783-84 (Tenn. Crim. App. 1997).

Nevertheless, we agree with Powers that the 1998 amendment was inapplicable in this case because the offense was committed before the effective date of the amendment. See State v. Smith, 893 S.W.2d 908, 919 (Tenn. 1994). Therefore, we shall address whether admission of this evidence constituted plain error under the law in effect prior to the 1998 amendment. See State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000).

In 1989, the General Assembly amended the (i)(2) aggravating circumstance to provide that a jury could consider as an aggravating factor that "the defendant was previously convicted of one

---

[9] In 1998, Tennessee Code Annotated section 39-13-204(c) was amended to add the following language:

> In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction. Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of such evidence is outweighed by prejudice to either party. Such evidence shall be used by the jury in determining the weight to be accorded the aggravating factor.

1998 Tenn. Pub. Acts, ch. 915, § 1 (effective May 7, 1998).

15

(1) or more felonies, other than the present charge, whose *statutory elements* involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2) (1991) (emphasis added). It is this version of the statute that is applicable here. In State v. Sims, 45 S.W.3d 1, 11-12 (Tenn. 2001), we held that whether the statutory elements of an offense involve the use of violence to the person must be determined by the trial court, not the jury. In Sims, the State introduced evidence of two prior convictions for aggravated assault to establish the prior violent felony circumstance. We recognized that the statutory elements of aggravated assault do not necessarily involve the use of violence. Accordingly, we approved a procedure in which the trial judge, outside the presence of the jury, considers the underlying facts of the prior assaults to determine whether the elements of those offenses involved the use of violence to the person. If the trial court determines that the statutory elements of the prior offense involved the use of violence, the State may introduce evidence that the defendant had previously been convicted of the prior offenses. The trial court then would instruct the jury that those convictions involved the use of violence to the person. See id. The trial court in this case did not follow this procedure. Instead, it admitted evidence of facts underlying Powers' prior felony convictions to prove the (i)(2) aggravating circumstance. Therefore, the trial court erred by permitting the jury to consider evidence of these facts unless the evidence was relevant to some other issue raised in sentencing. See Chalmers, 28 S.W.3d at 917; see also State v. Stout, 46 S.W.3d 689, 701 (Tenn. 2001).

The State contends that the underlying facts of the prior convictions were admissible to prove the (i)(6) aggravating circumstance that the murder was committed for the purpose of avoiding prosecution. See Tenn. Code Ann. § 39-13-204(i)(6) (Supp. 1996). The State presented testimony from two women who had been assaulted by Powers. Both women had positively identified Powers as their attacker, and their statements led to his apprehension and prosecution. The State also introduced the county clerk's records and a portion of the transcript of Powers' guilty plea relating to his robbery and aggravated assault of Clyo Griffin in 1984. In addition, the State introduced evidence of Powers' 1996 conviction for assault with a deadly weapon against a federal officer. The State argues that Powers killed Mrs. Sanderson so that she would not be able to identify him as the person who kidnapped and robbed her, thus enabling him to avoid prosecution.

In Stout, we found similar evidence proper to establish this same aggravating circumstance. 46 S.W.3d at 700-01. The relevant information showing that Shannon Sanderson was killed to avoid prosecution for her kidnapping and robbery was Powers' similar assaultive behavior against women in the past. In each of those prior cases, Powers had been identified and convicted of an offense. We believe it is reasonable to infer from such information, in addition to the evidence that he took Mrs. Sanderson to an isolated area in another state to rob and kill her, that Powers killed Mrs. Sanderson in order to avoid similar identification and prosecution. Although we hold that these facts were admissible, we are concerned that the details of those offenses went beyond what was reasonably necessary to prove the (i)(6) aggravating circumstance. However, even excluding evidence of the facts underlying the prior violent felony convictions, the evidence supporting the (i)(6) aggravating circumstance was considerable and the mitigating evidence was slight. Therefore, this evidence did not affect the jury's sentencing determination to the defendant's prejudice. Thus, we conclude that any error was harmless beyond a reasonable doubt. See Chalmers, 28 S.W.3d at 918.

16

EXCLUSION OF DEFENSE EVIDENCE
ATTACKING THE CHARACTER OF THE VICTIM

Powers maintains that the trial court erred by limiting his proof regarding the victim's "bad character." The trial court ruled that Powers had a right to rebut the victim impact evidence introduced by the State. The court refused, however, to allow him to introduce evidence regarding extramarital relationships the victim may have had or difficulties in her marriage. We hold that the trial court acted properly in excluding this evidence.

Rule 401 of the Tennessee Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In State v. Teague, this Court held that "evidence of the defects in the victim's character . . . is not relevant mitigating evidence . . . ." 680 S.W.2d 785, 788 (Tenn. 1984); see also State v. Johnson, 698 S.W.2d 631, 634 (Tenn. 1985) (stating that the defendant's "argument that a showing that the victim dealt in stolen property would somehow mitigate his murder of the victim is erroneous"). Powers claims that Teague is no longer sound law and points to Payne v. Tennessee, 501 U.S. 808 (1991), and State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998), as support for this contention. He argues that these cases make a victim's character relevant to the harm caused by the defendant as well as to the circumstances of the offense. He contends that evidence of a victims' character, therefore, should be admissible. However, Powers' interpretation of these two cases is flawed.

In Payne, the United States Supreme Court permitted the use of victim impact evidence in a capital case to "level the playing field" so as to ensure that both the victim and the accused receive justice. See Payne, 501 U.S. at 827. The Court noted that "just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." Id. at 825. Several years later, this Court reaffirmed that victim impact evidence is permissible under both the United States and Tennessee Constitutions as being "relevant to punishment." Nesbit, 978 S.W.2d at 887, 889. In Nesbit, we stated that

> [g]enerally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, [footnote omitted] the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

Id. at 891. In addition, we noted that such evidence could be excluded when it would threaten to render the proceedings fundamentally unfair or pose a danger of unfair prejudice. Id.

In the present case, the victim impact evidence presented by the State was appropriately limited to a "brief glimpse" of how the lives of the victim's three children were adversely impacted by her death. We fail to see how evidence that the victim's personal life was less than ideal is

17

relevant to rebut this evidence or how it could mitigate Powers' culpability for the crime. Powers was not limited as to the quantum of proof he could introduce related to his own character, his record, or any mitigating circumstances.

Neither Payne nor Nesbit explicitly addresses the relevance of evidence that relates to a victim's bad character. Given the purpose underlying the admission of victim impact evidence, however, Powers' reliance on these cases is misplaced. Payne and Nesbit both address the need to provide justice for the victim. This goal would be completely undermined if we were to grant criminal defendants unfettered discretion to disparage the victim's character, as Powers would have us do. Therefore, we reject Powers' argument that a defendant should be allowed to rebut the showing of specific harm by introducing evidence of the character of the victim once the State has introduced evidence of the specific harm caused by the victim's death in the form of victim impact evidence. We also reject Powers' suggestion that Payne and Nesbit overruled the holding in Teague. We conclude that Teague is still good law. Accordingly, we hold that the trial court's decision to deny evidence of the victim's "bad character" was proper.

PROPORTIONALITY REVIEW

Although the issue of proportionality was not raised by Powers, we are bound by statute to review the application of the death penalty to determine whether:

> (A) The sentence of death was imposed in any arbitrary fashion;
>
> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
>
> (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
>
> (D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1) (1997). Having thoroughly reviewed the record, we find that the sentence of death was not imposed in an arbitrary fashion. We have already determined that the State presented sufficient evidence to support application of the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(6). We also conclude that the State presented sufficient proof to uphold the jury's finding of the aggravating circumstances in Tennessee Annotated section 39-13-204(i)(2) and (i)(7). The proof in this case demonstrates that the prior aggravated assaults and robbery all involved the use of violence to the person as did the federal offense of assault. In addition, the record showed that Powers forced Mrs. Sanderson into his car and drove her to an isolated part of Mississippi to rob and kill her. This proof is sufficient to support a finding that the murder was knowingly committed by Powers while he was committing a

kidnapping. We further hold that the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

Next, we are compelled to consider whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. See Tenn. Code Ann. § 39-13-206(c)(1)(D) (1997).

> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in choosing and comparing cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. See id. In comparing defendants, we consider the following traits: 1) prior criminal history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of victim; and 8) capacity for rehabilitation. See id.

In the present case, the victim was shot in the head and left in a storage room in the back of an abandoned house in another state. The motive for the killing was to rob the victim and to avoid arrest and prosecution. The murder was premeditated, and no evidence was presented to show either provocation or justification.

Powers, an Asian male, was forty-two years old at the time of the murder. He had a number of prior convictions, including three separate aggravated assault convictions, a robbery conviction, and a conviction for assault with a dangerous weapon on a federal officer. He was on parole when the murder was committed. No evidence was presented to show that Powers cooperated with authorities. In fact, there is evidence to show that he tried to evade authorities on at least three different occasions, both before and after his arrest. Furthermore, no evidence was presented to show that Powers displayed any remorse for the murder. Considering the nature of the crime and the defendant, we conclude that this murder places Powers into a class of defendants for whom the death penalty is an appropriate punishment.

19

We have found several prior cases involving facts similar to those in this case in which the death penalty was imposed. For instance, in State v. Stout, 46 S.W.3d 689 (Tenn. 2001), the defendant and three co-defendants abducted a woman from her driveway, forced her into the backseat of her car at gunpoint, drove her to an isolated location, and shot her once in the head. See id. at 693-99. After taking a suitcase from the victim's car, the defendant and one of his accomplices left the area, leaving the victim behind. See id. at 693. The defendant was convicted of first degree felony murder, especially aggravated kidnapping, and especially aggravated robbery. See id. at 692. He was sentenced to death on the basis of three aggravating circumstances: (1) that he had prior violent felony convictions, (2) that he had committed the murder to avoid arrest and prosecution, and (3) that he committed the murder while committing robbery or kidnapping. See id.

In State v. Bates, 804 S.W.2d 868 (Tenn. 1991), the defendant pleaded guilty to first degree murder and grand larceny and was sentenced to death. See id. at 871, 883. The defendant was on escape status from Kentucky when he abducted a woman. See id. at 872. He took her into some nearby woods, tied her to a tree, gagged her, and shot her once in the head. See id. He then hid her body under some brush and tree limbs and stole her car and traveler's checks. See id. He eventually confessed. See id. at 873. The jury found three aggravating circumstances: (1) that he had prior violent felony convictions, (2) that he had committed the murder to avoid arrest and prosecution, and (3) that he committed the murder while kidnapping and robbing the victim. See id. at 882.

In State v. King, 718 S.W.2d 241 (Tenn. 1986), the defendant was sentenced to death after being convicted of murder in the first degree while in the perpetration of a simple kidnapping by confinement and armed robbery. See id. at 243. He abducted a woman, confining her in the trunk of her own car. See id. at 244. He drove her to an isolated location where he made her lie on the ground and then shot her in the head. See id. The jury found four aggravating circumstances: (1) that he had prior violent felony convictions, (2) that he had committed the murder to avoid arrest and prosecution, (3) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, and (4) that he committed the murder while kidnapping and robbing the victim. See id.

Based upon an exhaustive review of the record and Rule 12 reports from trial judges in trials for first degree murder in which either life imprisonment or a sentence of death has been imposed, we conclude that the following additional cases in which the death penalty was imposed also bear similarities with the current case. See State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000) (defendant shot victim during a robbery and was sentenced to death based on the sole aggravating factor that he had previously been convicted of a violent felony); State v. Burns, 979 S.W.2d 276 (Tenn. 1998) (defendant shot and killed victim during a robbery and was sentenced to death based on the jury's finding that he knowingly created a great risk of death to two or more persons other than the murdered victim); State v. Carter, 714 S.W.2d 241 (Tenn. 1986) (after abducting his victim, shooting him to death, rolling his body over a cliff, and stealing his truck, defendant was sentenced to death based on the aggravating circumstances that he committed the murder to avoid arrest and prosecution and committed the murder while committing larceny and kidnapping). After reviewing these cases, and many others not specifically cited, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

20

CONCLUSION

In accordance with Tennessee Code Annotated section 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to the issue of identification testimony, which was raised in this Court but not addressed in this opinion, we affirm the Court of Criminal Appeals. Relevant portions of that opinion are incorporated herein and are attached as an appendix. The defendant's sentence of death is affirmed and shall be carried out on the 15th day of May, 2003, unless otherwise ordered by this Court or proper authority. It appearing that defendant Gerald Lee Powers is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, JUSTICE

21

APPENDIX

(Excerpts from the Court of Criminal Appeals' Decision)

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
December 5, 2000 Session

## STATE OF TENNESSEE v. GERALD L. POWERS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 96-08230 & -08231      Joseph Dailey, Judge**

---

**No. W1999-02348-CCA-R3-DD - Filed September 28, 2001**

---

The Defendant, Gerald L. Powers, was convicted by a jury of first degree felony murder in the perpetration of a robbery and of aggravated robbery. The jury sentenced the Defendant to death for the murder on the basis of three aggravating circumstances: that the Defendant was previously convicted of one or more violent felonies; that the Defendant committed the murder to avoid his arrest and/or prosecution; and that the Defendant committed the murder while committing a kidnapping. The trial court subsequently sentenced the Defendant as a Range III persistent offender to thirty years incarceration for the aggravated robbery, to be served consecutive to the death sentence. In this appeal as of right, the Defendant challenges his convictions, raising the following issues: (1) whether the evidence identifying him as the perpetrator is sufficient; (2) whether a variance between the indictment and the proof at trial is material and prejudicial; (3) whether the trial court had jurisdiction over the crimes; (4) whether the Defendant's wife's testimony should have been suppressed pursuant to the marital communications privilege; (5) whether the trial court erred in refusing to admit evidence in support of a third-party defense; (6) whether the trial court erred in admitting a lay witness's testimony identifying photographs as being of the Defendant; and (7) whether the trial court erred in admitting a deposition taken in Mississippi by a Tennessee notary public. The Defendant challenges the imposition of the death sentence on the following grounds: (1) whether the trial court erred in admitting the facts underlying the Defendant's prior felonies; (2) whether the Defendant's prior felonies were violent within the meaning of the statutory aggravating circumstance; (3) whether the evidence is sufficient to support the jury's finding that the Defendant committed the murder to avoid his arrest and/or prosecution; (4) whether the trial court erred in refusing to admit evidence of the victim's bad character; and (5) whether Tennessee's death penalty scheme is constitutional. Finally, the Defendant contends that the trial court should have sentenced him as a Range II offender for the aggravated robbery. Upon our review of the record and relevant legal authority, we find no reversible error in the Defendant's convictions or in the imposition of the death sentence. We reduce the Defendant's sentence for the aggravated robbery to twenty years. In all other respects, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

W. Mark Ward, Assistant Public Defender, (on appeal), Memphis, Tennessee; Tony N. Brayton, Assistant Public Defender, (on appeal), Memphis, Tennessee; Garland Erguden, Assistant Public Defender, (on appeal), Memphis, Tennessee; Loyce Lambert-Ryan, Assistant Public Defender, (at trial), Memphis, Tennessee; and Larry H. Nance, (at trial), Memphis, Tennessee, for the appellant, Gerald Powers.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; William L. Gibbons, District Attorney General; Amy P. Weirich, Assistant District Attorney General; and Jerry R. Kitchen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**[DELETED: SUMMARY OF FACTS]**

**ANALYSIS:  GUILT PHASE ISSUES**

**[DELETED: I.  SUFFICIENCY OF IDENTIFICATION EVIDENCE]**

**[DELETED: II.  VARIANCE BETWEEN INDICTMENT AND PROOF]**

**[DELETED: III.  JURISDICTION]**

**[DELETED: IV. MARITAL PRIVILEGE]**

**[DELETED: V. ADMISSIBILITY OF EVIDENCE TO SHOW THIRD PARTIES'
MOTIVES TO MURDER THE VICTIM]**

**VI.  IDENTIFICATION TESTIMONY**

During the course of his testimony explaining the surveillance videotapes taken at Sam's Town casino on the night of April 18, 1996, Tom Scott repeatedly referred to the person seen in the tapes as "Mr. Powers."  Mr. Scott did not know the Defendant; rather, he referred to the person as "Mr. Powers" on the basis of information provided to him by the F.B.I.  Accordingly, the Defendant objected to Mr. Scott's identification of him as based on inadmissible hearsay. The trial court overruled the Defendant's objection, and the Defendant now argues that the trial court's ruling was error.

We agree with the Defendant that Mr. Scott should not have been allowed to refer to the  person shown in the tapes as "Mr. Powers."  "A witness may not testify to a matter unless

**Appendix - pg. 2**

evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tenn. R. Evid. 602. Mr. Scott admitted that he had no personal knowledge of the Defendant's appearance or identity and that his knowledge of the Defendant's identity was based on information provided to him by the F.B.I. Accordingly, the trial court erred in overruling the Defendant's objection.

During the State's redirect examination of Mr. Scott, the prosecutor asked him to identify whether any person in the courtroom was the person shown in the videotape. Over defense counsel's objection, the trial court allowed Mr. Scott to testify that the person in the videotape was the Defendant. We agree with the Defendant that the prosecutor's question called for an opinion from a lay witness.

Our Rules of Evidence provide that a lay witness's testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Certainly, Mr. Scott's testimony that the person in the tape was the Defendant was "rationally based" on Mr. Scott's perception of the similarities between the photographs and the Defendant's person in the courtroom. Id. However, Mr. Scott's opinion about the identity of the person in the tape was not necessary to a clear understanding of his testimony, nor was it helpful in the determination of a fact in issue. While the Defendant's identity as the man in the tape was certainly an issue in the trial, Mr. Scott was in no better position to identify that person as the Defendant than were the jurors: Mr. Scott had no more past familiarity with or knowledge of the Defendant than did they. Thus, we find that the trial court erred in permitting the State to seek Mr. Scott's opinion on this issue.

Nevertheless, we find both of the trial court's errors regarding Mr. Scott's testimony to be harmless. The jurors saw the videotape and had the Defendant before them; each juror therefore had the opportunity to determine for her or himself whether the person in the video was the Defendant. Mr. Scott admitted that he did not know the Defendant and admitted that his identification was based on hearsay information. Moreover, Ms. Powers viewed a still photograph made from the surveillance tapes and identified the person therein as the Defendant. Ms. Powers was certainly qualified to testify as to the Defendant's identity, and we are confident that the jury gave far more weight to her testimony than it did to Mr. Scott's. Accordingly, we find this issue to be without merit.

**[DELETED: VII. ADMISSIBILITY OF MARGARET YORK'S DEPOSITION]**

**ANALYSIS: SENTENCING PHASE ISSUES**

**[DELETED: VIII. ADMISSIBILITY OF FACTS UNDERLYING PRIOR VIOLENT FELONIES]**

**[DELETED: IX. WHETHER THE DEFENDANT'S PRIOR CONVICTIONS WERE ADMISSIBLE TO ESTABLISH THE AGGRAVATING CIRCUMSTANCE FOR PRIOR VIOLENT FELONIES]**

**[DELETED: X. SUFFICIENCY OF EVIDENCE ESTABLISHING THAT THE DEFENDANT COMMITTED THE MURDER TO AVOID HIS ARREST AND/OR PROSECUTION]**

**[DELETED: XI. ADMISSIBILITY OF VICTIM'S CHARACTER EVIDENCE]**

**[DELETED: XII. CONSTITUTIONALITY OF TENNESSEE'S DEATH PENALTY]**

**[DELETED: XIII. PROPORTIONALITY REVIEW]**

**[DELETED: XIV. DEFENDANT'S STATUS AS A RANGE III OFFENDER]**

**CONCLUSION**

We have carefully reviewed the record of this case and the issues raised by the Defendant. We have further conducted a proportionality review of the sentence of death imposed upon the Defendant. Finding no reversible error in the guilt phase of the trial; finding that the death penalty is proportionate to the crime, that it was neither arbitrarily nor capriciously applied; finding that the evidence supports the jury's finding of the three aggravating circumstances; and finding that the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances, we affirm the Defendant's convictions and sentence of death. Finding that the trial court erred in sentencing the Defendant as a Range III offender, we reduce his sentence for the aggravated robbery to twenty years as a Range II offender. In all other respects, the judgment of the trial court is AFFIRMED.

ROBERT W. WEDEMEYER, JUDGE


CONCUR:

JOE G. RILEY, Judge

JOHN EVERETT WILLIAMS, Judge