IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 20, 2006 Session

## RICKY R. BRYAN  v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Rutherford County**
**No. F-57092     Don R. Ash, Judge**

---

**No. M2005-02889-CCA-R3-PC Filed August 2, 2006**

---

The Appellant, Ricky R. Bryan, appeals the judgment of the Rutherford County Circuit Court denying post-conviction relief.  Bryan was convicted of first degree murder and subsequently sentenced to life in prison without the possibility of parole.  On appeal, Bryan argues that he was denied his Sixth Amendment right to the effective assistance of counsel, specifically arguing that trial counsel was ineffective for failing to introduce evidence of third party guilt in the homicide. After review, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Darrell L. Scarlett, Murfreesboro, Tennessee, for the Appellant, Ricky R. Bryan.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Factual Background**

    This case has a long and varied procedural history.  The Appellant was first convicted of the murder of the victim, Charlotte Scott, in 1995.  However, at the conclusion of that first trial, the trial court, acting as the thirteenth juror, granted the Appellant's motion for a new trial.  *State v. Ricky Raymond Bryan*, No. M2002-03015-CCA-R3-CD (Tenn. Crim. App. at Nashville, May 24, 2004). Following a second trial, the Appellant was again found guilty of first degree murder and sentenced to life imprisonment.  *Id*.  However, on direct appeal, a panel of this court remanded the case for a new trial based upon a finding that the introduction of the Appellant's statement had violated his

Fifth Amendment right against self-incrimination. *Id.* Following a third trial, the Appellant was again convicted of first degree murder and received a sentence of life imprisonment without the possibility of parole. *Id.* That conviction was affirmed by a panel of this court on direct appeal. *Id.*

The facts of the case, as established on direct appeal of the Appellant's third conviction, are as follows:

The victim's family filed a missing person report with the Metro Nashville Police Department on Tuesday, October 18, 1994. The report indicated that the seventy-two year old victim disappeared from her apartment some time between October 15 and October 16. David Miller, a homicide detective with the police department at the time of the offense, conducted the initial search of the victim's apartment. The apartment was neat and orderly and showed no signs of a struggle. The coffee pot was filled with water and coffee, a routine the victim generally performed prior to retiring for the evening. The victim's car was parked in front of the apartment building and showed no sign of tampering. A luminol test did not detect the presence of any blood in either the apartment or the victim's car. Detective Miller found a drug store receipt in a trash can showing that a prescription for the victim was filled at 3:48 p.m. on Saturday, October 15.

Detective Miller then investigated whether the victim's bank account reflected any recent activity. An initial discussion with First American National Bank, the victim's bank, revealed that the victim's bank card had been used to withdraw $40.00 from a First American Bank automated teller machine (ATM) sometime after 3:00 p.m. on Friday, October 14 and before Monday morning, October 17. Three other inquiries between October 14 and October 17 were made with the victim's bank card after the $40.00 cash withdrawal at a First Tennessee Bank ATM located at Nipper's Corner.[1]

The victim's family told Detective Miller that Ms. Scott had been dating Defendant for a period of time but had recently broken off the relationship. Detective Miller interviewed Defendant at his workplace on October 28, and Defendant said that he did not know where the victim was. Defendant told Detective Miller that he first met the victim in 1988 when he was thirty-two years old. The victim told Defendant she was fifty years old. After their initial meeting, the couple dated until August 1994 when the victim became angry with Defendant because he fixed a bicycle for a girl who lived in the victim's neighborhood. . . . On Friday, October 14, the victim called Defendant and they talked for fifteen or twenty minutes. Defendant said that he worked on Saturday, October 15, and did not see the victim. The next

---

[1] The first of the three transactions was an attempt to withdraw $200, the second was an attempt to withdraw $100, and the third transaction was an inquiry as to the account's balance. *Bryan*, M2002-03015-CCA-R3-CD..

day, Defendant and his daughter, Kimberly Bryan Cowart, stopped by the victim's apartment after church. Although the victim's car was parked outside the building, she did not answer Defendant's knock, and Defendant and his daughter left. During the interview, Detective Miller noticed a long scratch along the left side of Defendant's face but no other bruises, scrapes or scratches.

At the time of the offense, [Miss] Cowart was ten years old. Detective Miller interviewed [Miss] Cowart on November 3. . . . [Miss] Cowart and Defendant stopped by the victim's apartment on October 16 after church, but the victim was not home. [Miss] Cowart said that she and Defendant then went to Nipper's Corner, and Defendant attempted to retrieve some money from an ATM with a bank card. At trial, [Miss] Cowart added that before she and her father went to church on October 16, Defendant paced back and forth in their apartment repeating, "I don't want to go to jail."

. . . .

Detective Miller interviewed Defendant again on November 4 after his conversation with [Miss] Cowart. At this time, Defendant gave a second statement in which he admitted that he tried to withdraw some money with the victim's bank card at a First Tennessee ATM located at Nipper's Corner "on the day [the victim] could not be found."

. . . .

Danny Bryan, Defendant's brother, testified that Defendant had dated the victim about seven years. On November 6, after dinner at a local steakhouse, Defendant told Mr. Bryan that he wanted to speak with him in private. Later that evening, the two men walked to a set of railroad tracks which ran between an apartment complex and a shopping center near Defendant's house. Defendant told Mr. Bryan that he knew where the victim was because he had buried her in a rock quarry near Sam Ridley Parkway. Defendant told Mr. Bryan that the victim asked him to come to her house on October 15 when she telephoned that night. Defendant waited until his daughter was asleep and then drove to the victim's house around midnight. The victim suggested that they go to the rock quarry so they could talk. After they arrived, the victim told Defendant that she wanted something to eat, and Defendant left the victim sitting alone on a blanket while he went back into town to get some food. When he returned, Defendant could not find the victim. Defendant told Mr. Bryan he spotted a vehicle down the road and heard three or four male voices. After the men left, Defendant explored the area where the men had been and found the victim dead. Defendant said that he pulled the victim into the woods by her legs and buried her. When Mr. Bryan asked why he buried the victim, Defendant

responded that he did so because he was scared. Defendant denied that he had anything to do with the victim's death.

. . . .

Clayton Thomas, an investigator with the Smyrna police department at the time of the offense, testified that the police initiated a search of the area surrounding the rock quarry near Sam Ridley Parkway on November 7 based on the general information provided by Danny Bryan. . . . The rocky and woody terrain was difficult to negotiate, and eventually this search was unproductive.

. . . .

[Michael] Thompson [Defendant's step-nephew] asked Defendant if there was anything he could do to help him. Defendant told Mr. Thompson that when he went to the rock quarry to search for the victim, he had left behind a rake and shovel. Defendant drew a map in the notebook to show Mr. Thompson where to find the tools. Defendant noted the location of Sam Ridley Parkway, LaVergne High School, and an access road leading to the rock quarry on the map. Defendant indicated that the rake and shovel were located about fifteen feet from the access road. He said that the pit located in this area was filled with debris and old mattresses which Defendant used to hide the tools. Defendant then burned the map. Mr. Thompson, however, described the location of the tools based on the information provided by Defendant to Officer Thomas. Police officers searched the area indicated on Defendant's map and within minutes found the victim's body in a debris-filled pit.

Rosa Bryan [wife of Defendant's brother Danny] discovered the notebook in December while she and her husband were staying in Defendant's house after his arrest and gave it to Officer Thomas. At trial, Grant Sperry was qualified as an expert in forensic document examination. Based on the decipherable impressions and indented writings found in the notebook, Mr. Sperry was able to make out some of the words on a drawing that appeared to be a map including, among others, "Sam Ridley," "school," "shovel and rake," and "where dozer has cleared." Mr. Sperry compared the features and characteristics of the indented writings on the notebook's remaining pages with known samples of Defendant's handwriting. Based on this comparison, Mr. Sperry testified that the indented writings in the notebook had been made by Defendant.

. . . .

Doctor Charles Harlan performed the autopsy on the victim and testified that the victim had suffered numerous injuries both before and after death. . . . The victim's death . . . resulted from a blunt force trauma to the chest which fractured the victim's

ribs in forty-four places. . . . After the victim had died, she was stabbed several times in the abdomen and on the thighs and both of her breasts were amputated.

*Id.*

On May 18, 2005, the Appellant filed a *pro se* petition for post-conviction relief alleging, among other grounds, ineffective assistance of counsel. Counsel was later appointed, and an amended petition was filed on September 26, 2005. A post-conviction hearing was held on November 14, 2005, at which only the Appellant and trial counsel testified. The Appellant's alleged claim of ineffective assistance of counsel was based solely upon trial counsel's failure "to investigate and utilize handwriting expert's opinions."

The Appellant testified that he received numerous letters from his daughter-in-law, Ruth Ann Bryan, while he was in jail. He further stated that on a letter he received January 15, 1998, he noticed "an indention" on the paper left from previous writings on the same pad. He testified that "out of pure curiosity," he tried to read the underlying impressions by shading the area with graphite. Based upon what he saw, the Appellant sent several of the letters to his family, and his uncle hired a handwriting expert to examine and compare the impressions with the handwriting contained in the letters purportedly written by Ruth Ann Bryan. Following his examination, the handwriting expert sent a report back to the Appellant which indicated that the person who made the impressions was the same person who had written the original letters, presumably Ms. Bryan. The report also contained partial phrases that the expert was able to "pull out" from the impressions. The recovered portions included a shopping list and the phrase "I seen Mom's p when she was here. It would look good cut out and framed." A separate letter contained impressions from which the expert was able to "pull out" the following fragments: "Kill the - - off the - -. Floors of - - good. To the car." A separate impression read, "Shannon raised his car after I stole it October 15, 1994." A separate letter contained an impression which read, "This is funny. I killed the B. I killed the W. I killed the P that Rick will not F anymore. Ha ha." Finally, the expert was able to identify one impression which stated, "I killed Lottie."

The Appellant testified that he informed trial counsel of the expert's findings, providing him with a copy of the report, but that trial counsel referred to them as "garbage" and would not use them during trial. During his testimony, the Appellant acknowledged that it was only after he observed the State's technique in procuring the incriminating map against him that he had the impressions analyzed by his own expert.[2] However, he asserts that if the letters, along with the expert's testimony had been presented at trial, the jury might have believed someone other than himself committed the murder.

---

[2]Moreover, testimony at the hearing established that within the portion of the envelope which is sealed by glue, in which the impressed letters were contained, were the instructions, "Address this to Ricky Bryan. Mail back to Rutherford County Jail."

Trial counsel testified that he was provided a copy of the report prepared by the handwriting expert. Counsel related that during a pretrial discussion of the impressions, the Appellant informed him that he did not believe Ms. Bryan committed the murder because Ms. Bryan "barely knew" the victim and had no reason to harm her. Moreover, during pretrial discussions, trial counsel noted that the facts, as provided by the impressions, with regard to how the murder was committed were completely inconsistent with any version of the facts provided by the Appellant, which were being relied upon in his defense. Based upon the determination of trial counsel and the Appellant that the impressions could not be "matched up" with any of the Appellant's three different versions as to his actions and the Appellant's belief that Ruth Ann Bryan did not commit the murder, a decision was made not to utilize the impressions. Trial counsel noted this decision was made only after consultation with the Appellant. Following the presentation of evidence, the post-conviction court entered an ordering denying the Appellant's petition for post-conviction relief, from which the Appellant filed a timely notice of appeal.

**Analysis**

To succeed on a challenge of ineffective assistance of counsel, the Appellant bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2003). The Appellant must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), the Appellant must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Id.* at 461. "[A] trial court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960

S.W.2d 572, 578 (Tenn. 1997)). However, *conclusions of law*, are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. *Id.*

On appeal, the Appellant argues that trial counsel was ineffective in that he failed "to utilize indented letters [or impressions] indicating someone other than the [Appellant] killed the victim and the expert testimony regarding the same." Thus, with regard to this allegation, the Appellant is required to establish by clear and convincing evidence (1) that the proffered "indented letters" would have been admitted at trial and (2) that there is a reasonable probability that the trial would have concluded differently if counsel had performed as suggested. In *Holmes v. South Carolina*, 547 U.S. ___, 126 S. Ct. 1727 (2006), the United States Supreme Court recently reiterated the long standing evidentiary rule:

> Evidence offered by accused as to the commission of the crime by another person must be limited to such facts as are inconsistent with his own guilt, and to such facts as raise a reasonable inference or presumption as to his own innocence; evidence which can have (no) other effect than to cast a bare suspicion upon another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible . . . . Before such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances, as tends clearly to point out such other person as the guilty party.

547 U.S. at ___, 126 S. Ct. at 1734. (Internal citations omitted).

In similar fashion, our supreme court held that a defendant is entitled to present evidence implicating another in the crime only if the evidence is relevant under Tennessee Rule of Evidence 401 and the evidence is not unfairly prejudicial as provided by Rule 403. *State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003). In a criminal case, evidence that a third party had the motive and opportunity to commit the offense certainly would be relevant. *Id*. at 395.

At the post-conviction hearing, trial counsel testified that, after discussing the issue with the Appellant, the decision was made not to utilize the impressions at trial, as they could not be reconciled with the Appellant's various versions of the events and because the Appellant did not believe that his sister-in-law murdered the victim. On appeal, the State argues that trial counsel's decision not to present third-party guilt was strategic and that post-conviction relief was properly denied.

In its order denying relief, the post-conviction court held as follows:

> This Court finds [trial counsel's] performance was not deficient in any manner and the [Appellant] was not prejudiced by the representation. [Trial counsel's] performed with extraordinary training and skill and protected the [Appellant's] interest with every decision and strategy pursued in his defense. This Court further does not find the alleged evidence presented by [the Appellant] to be

credible nor his testimony at the hearing to be credible. Therefore, this Court holds the [Appellant] has failed to prove by clear and convincing evidence his claim of ineffective assistance of counsel.

After review, we find nothing in the record to preponderate against the post-conviction court's findings.

Moreover, the record demonstrates that trial counsel's decision to forego use of the purported impression evidence, which the trial court found was not credible, was made following consultation with the Appellant and obtaining the Appellant's consent. As noted, trial counsel was unable to reconcile the impressions with the Appellant's version of the facts, and the Appellant did not believe the evidence was accurate. Accordingly, we conclude that trial counsel's election not to utilize the impression evidence constituted an informed tactical decision that was warranted under the facts of this case.

## CONCLUSION

Based upon the foregoing, the Rutherford County Circuit Court's denial of post-conviction relief is affirmed.

_____
DAVID G. HAYES, JUDGE