IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 6, 2018

## STATE OF TENNESSEE v. TRIMON PRUITT

**Appeal from the Circuit Court for Madison County**
**No. 16-233    Kyle Atkins, Judge**

_____

### No. W2018-00039-CCA-R3-CD

_____

Defendant, Trimon Pruitt, was indicted by the Madison County Grand Jury for first degree murder.  Following a jury trial, Defendant was convicted of second degree murder.  The trial court sentenced Defendant to 24 years' imprisonment with 100 percent release eligibility.  In this appeal as of right, Defendant contends: 1) the evidence at trial was insufficient to support his conviction; 2) the trial court erred by admitting into evidence a statement made by Defendant; 3) the trial court abused its discretion in sentencing Defendant.  Having reviewed the entire record and the briefs of the parties, we find no error.  Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

George Morton Googe, District Public Defender; and John D. Hamilton, Assistant Public Defender, Jackson, Tennessee, for the appellant, Trimon Pruitt.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; James G. Woodall, District Attorney General; and Aaron Chaplin and Nina Seiler, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

*Facts*

William Smith testified that he and the victim were both members of the gang "Traveling Vice Lords."  A man named "Country" was the chief of the gang.  Smith was known as "Malik," and the victim, Tony Willoughby, was known as "Bay."  On

December 2, 2015, Defendant, known as "Trey" or "Trey Poe," and another gang member, Antonio Woods, known as "Slug," picked up Smith and drove him and Defendant to meet the victim. Smith testified that when they arrived, Defendant "jump[ed] out [of] the car and r[a]n behind the dumpster." While Smith and Woods talked to the victim, Defendant approached them and asked the victim if his name was "Bay." The victim replied that it was, and Defendant "pulled a gun out and started shooting." Smith testified that he heard "at least five" gunshots. He testified that the victim "fell right there behind the truck and then he got up, and the Defendant kept shooting [the victim]." He testified that the victim "was trying to run, and every time that he got up to try to run the Defendant shot him." Smith testified that after Defendant shot the victim several times, Defendant stood over the victim, shot him again, then kicked him in the face and said, "[t]his is for Country." Smith identified Defendant as the shooter in a photo lineup on the night of the incident.

Smith testified that Defendant and "Slug" told him that they were going to "serve a quarter," which meant a violation, on the victim. Smith testified that the victim "was supposed to get beat up and that was it." He testified that Defendant called "Packman" and told him that "he didn't want to serve the violation, he wanted to kill [the victim], because [the victim] knew where everybody stayed at."

Woods testified that he, Smith, and Defendant met with two high-ranking Traveling Vice Lords, "Big 5" and "Courtney," to discuss the victim, who Woods testified was "bogus," which meant "[n]ot righteous." Woods then drove Defendant and Smith to meet the victim. When they arrived, Woods and Smith stood outside of the vehicle and waited for the victim to arrive. Defendant went behind a dumpster "to use the restroom." Woods and Smith were talking to the victim, and Defendant approached them with "his palms up," which meant that Defendant meant "no harm." Defendant greeted them and then turned to walk away. Woods testified that Defendant "took two or three steps away from [them], then turned back around and started shooting." Woods testified that Defendant chased the victim and continued to shoot at him. Defendant then "stood on top of [the victim] and shot." Woods began to drive away with Smith, and Defendant "flagged [him] down." Defendant got inside the car with Woods and Smith, and they drove to Defendant's girlfriend's house.

Woods initially told police that he did not know the shooter, and he gave a false description of the shooter to police. Woods testified that "later on that day," he told police that Defendant was the shooter. Woods testified that he did not know Defendant had a gun.

Police collected six .40 caliber shell casings from the crime scene. Tennessee Bureau of Investigation ballistics testing was unable to determine conclusively whether

the shell casings were fired from the same gun because they bore insufficient markings. Three .40 caliber bullets were recovered from the victim during autopsy. Police did not find a weapon on the victim.

Investigator Daniel Long interviewed Smith and Woods. Investigator Long determined that "there was a power conflict" within the Traveling Vice Lords. Smith stated that the original plan was to kill the victim but that Smith "believed that the plans were altered to just a beatdown." Investigator Long also interviewed Defendant. Defendant admitted that he was a gang member, and he acknowledged that he knew Smith and Woods. Defendant told Investigator Long that on December 2, 2015, he went to church with his family and went to his grandmother's house after church. Investigator Long listened to a recorded phone call between Defendant and his mother after Defendant's arrest in which Defendant told his mother to contact a woman named "Red" because he had stayed at her house on the night of the shooting. Investigator Long testified that the shooter was described as short, and Defendant's height is five feet two inches. He testified that Smith was six feet tall, and the victim was five feet nine inches tall. Police searched Defendant's bedroom and found gang-related material, which included a photograph of "Country," and weapons that did not match the caliber bullets found at the scene. Police also found a bag containing dreadlocks.

After investigating the crime scene, Sergeant Chris Chestnut, of the Jackson Police Department, spoke to the victim's family at the hospital. The victim's family suggested that Sergeant Chestnut speak to Marcus Clark, who was with the family at the hospital. Clark was cooperative, and he admitted that he was at the scene when the victim was shot. Clark told police that he had taken the victim to Allenton Heights to meet two men known as "Slug" and "Malik." Clark was familiar with "Slug," but he did not know "Malik." Clark did not identify the shooter, but he told police that Slug was not the shooter. In a subsequent interview, Clark described the shooter as "extremely short."

Marcus Clark testified that he and the victim grew up together. Clark testified that the victim was a member of the "Vice Lord" gang. On December 2, 2015, Clark picked up the victim at the victim's house and drove him to meet "Slug" and "Malik" in Allenton Heights. When they arrived, the victim got out of the car to meet with them. Clark testified that he knew "Slug" from seeing him in "the streets." Clark stayed in his vehicle. He saw the victim talking to the other two men. Clark testified, "I looked back [and] I just so happened to heard [sic] the gunshots. And then I seen [sic] a third person chasing [the victim] behind the truck." That person was shooting at the victim. Clark described the shooter as short and wearing a black hoodie. He testified that the shooter was "smaller" and "a little skinnier" than the victim. Clark did not see the shooter's face. Clark testified that he did not see "Slug" or "Malik" with a gun. Clark drove away from the scene, and his vehicle was struck by gunfire.

Dr. Miguel Laboy, a forensic pathologist, performed an autopsy on the victim's body and determined that the cause of death was multiple gunshot wounds. Dr. Laboy discovered six gunshot wounds on the victim's body and two graze wounds to the victim's chin and right elbow. Dr. Laboy testified that one of the bullets entered under the victim's arm and exited the front of his body. Two other bullets entered the victim's back and exited the front of his body. Two other bullets entered the victim's back and lodged in his body. Another bullet entered the victim's buttock and lodged in his pelvis. Dr. Laboy also discovered a contusion in the victim's "deep scalp" that could be consistent with having been kicked in the head.

Defendant testified at trial. He acknowledged that he was a gang member. Defendant testified that "Red" was "a female that [he] was associated with." He testified that he told his mother that "she should go and talk to Red, maybe Red could help me out or something along those lines. I believe I also told her that I may have spent the night over there." Defendant testified that he went to church and then stayed at his grandmother's house on the night of the shooting. Defendant denied shooting the victim. Defendant acknowledged that he had prior convictions for auto burglary and simple possession. On cross-examination, Defendant testified that he was on probation at the time of the offense in this case. Defendant testified that he knew Smith and Woods. He testified that he had dreadlocks at the time of the incident, and that he had since cut his hair. Defendant testified that he had "[n]ever carried out a violation" as a member of the gang.

Dorothy Pruitt, Defendant's grandmother, testified that Defendant lived with her at the time of the incident. She testified that Defendant went to church that night. She testified, "anybody that comes to my house needs to be there by 10:00 [p.m.] or I'm locking up." She testified that Defendant was home by 10:00 p.m. on the night of the incident. Ms. Pruitt testified that she did not come forward with an alibi until one week before trial because "[she] had no reason to."

### Sentencing hearing

At the sentencing hearing, the victim's mother, Danielle Watford, testified that the death of her son had a devastating impact on her family and his three children. Ms. Watford testified that she was in counseling and on medication for anxiety. She testified that her church family was her "strength." She requested that the trial court impose the maximum sentence.

The victim's grandmother, Janice Fuller, testified, "I'm not painting [him] as a saint, but to be gunned down the way he was . . . ." She testified that there were "no

words to say how [her] life ha[d] changed" since the night the victim was killed. She also requested that the trial court impose the maximum sentence. She also testified that she forgave Defendant and that Defendant "still has a chance to have a productive life."

The victim's uncle, Chaucey Fuller, testified about the impact the victim's death had on his family. He testified, "[a]t the drop of a dime my mother will break out into tears and just anything can trigger it." Mr. Fuller expressed compassion for Defendant's family. He testified that Defendant was "sociopathic" and that "he really felt like he was the smartest guy in the room when he took the stand, and that – and that scared me a little bit." Mr. Fuller also requested that the trial court impose the maximum sentence.

Defendant's grandmother, Dorothy Pruitt, testified that she had raised Defendant. She testified that Defendant lived with her and was employed at a "temp" service at the time of the offense. Ms. Pruitt testified that Defendant was "very active in the church."

Defendant testified at the sentencing hearing. He acknowledged that the presentence report stated that he had refused to cooperate with the probation officer who prepared the report. Defendant explained that he refused to meet with the probation officer while he was incarcerated because he was "not on probation or parole" at the time. Defendant also acknowledged that he had been in "a couple fights" while incarcerated. He testified that he was defending himself and that he did not provoke the altercations. He also admitted that he refused to return to his cell during one incident. He explained that he was "trying to go to a different pod." Defendant acknowledged that he was on probation at the time of the offense in this case. He testified that he believed he could be rehabilitated.

The trial court found six enhancement factors and declined to apply any of the mitigating factors suggested by Defendant. The trial court sentenced Defendant to 24 years' incarceration and ordered that his sentence would run consecutively to a sentence for which Defendant was on probation, finding that Defendant was a dangerous offender and his behavior indicated little or no regard for human life; that he showed no hesitation about committing a crime where the risk to human life was high; and the circumstances surrounding the commission of the offense were aggravated. The trial court also found that confinement for an extended period of time was necessary to protect society from Defendant's unwillingness to lead a productive life and Defendant's resort to criminal activity in furtherance of an anti-social lifestyle. Finally, the trial court found that the aggregate length of the sentence was reasonably related to the offense. The trial court acknowledged the length of Defendant's sentence was high but noted that Defendant expressed no remorse. The court also noted that Defendant shot the victim multiple times and kicked him in the head.

*Analysis*

*Admissibility of Defendant's statement*

Defendant argues that the trial court erred by admitting Defendant's statement, "[t]his is for Country" into evidence. Defendant argues that the statement was unfairly prejudicial. The State responds that the statement was properly admitted into evidence.

Defendant filed a motion in limine requesting that the statement be excluded from evidence. Following a hearing on Defendant's motion, the trial court concluded that "the probative value is not outweighed by the danger of unfair prejudice." The trial court concluded that the statement was admissible because it was relevant "to motive and intent."

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Like other decisions regarding the admissibility of evidence, decisions regarding the relevance of evidence are reviewed for abuse of discretion. *State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *State v. March*, 395 S.W.3d 738, 781 (Tenn. Crim. App. 2011). A court abuses its discretion when it applies an incorrect legal standard or it reaches a decision that is against logic or reasoning and that causes an injustice to the complaining party. *State v. Merriman*, 410 S.W.3d 779, 791 (Tenn. 2013).

On appeal, Defendant argues that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice because the statement was "inflammatory." We discern no abuse of discretion in the trial court's decision to allow Defendant's statement into evidence. The statement was relevant to show Defendant's intent, which is an element of the crime for which Defendant was charged. The evidence established that the shooting was a result of an internal power conflict in the "Traveling Vice Lords" gang, of which "Country" was the chief member. The evidence was also relevant because police found a photograph of "Country" in Defendant's bedroom, and the evidence helped to corroborate the witnesses' testimony that Defendant kicked the victim in the head when he made the statement because the forensic pathologist testified that the victim had a "deep scalp" contusion that was consistent with a kick to the head.

- 6 -

Defendant has not established that the trial court abused its discretion. Defendant is therefore not entitled to relief on this issue.

*Sufficiency of Evidence*

Defendant challenges the sufficiency of the evidence, arguing the evidence was insufficient to sustain his second degree murder conviction. Defendant contends that his conviction was based on uncorroborated accomplice testimony. He also argues that the accomplices lacked credibility.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also* Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Id*. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was convicted of the lesser-included offense of second degree murder, which is "[a] knowing killing of another[.]" T.C.A. § 39-13-210(a)(1). In the light most favorable to the State, the proof presented at trial showed that Defendant, Smith, and Woods drove to meet the victim. When they arrived, Defendant went behind a dumpster, and Smith and Woods talked to the victim. Defendant then approached the victim and fired multiple shots at the victim as the victim tried to run away. Both Smith and Woods identified Defendant as the shooter.

Defendant is correct, however, that when the only proof of a crime is the uncorroborated testimony of one or more accomplices, then the evidence is insufficient to sustain a conviction as a matter of law. *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little*, 402 S.W.3d 202, 211-12 (Tenn. 2013)). Additionally, accomplices cannot corroborate each other. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn.

- 7 -

Crim. App. 2001). This court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). This means that the person must do more than have a guilty knowledge, be morally delinquent, or participate in other offenses with the principal actor. *State v. Jackson*, 52 S.W.3d 661, 666 (Tenn. Crim. App. 2001). The test for whether a witness qualifies as an accomplice is "whether the alleged accomplice could be indicted for the same offense charged against the defendant." *Allen*, 976 S.W.2d at 666.

Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, our supreme court has noted that the corroboration required can be slight. The court stated that in order to properly corroborate accomplice testimony:

> [t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. The corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's [testimony].

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). The sufficiency of the corroboration is a determination entrusted to the jury as the trier of fact. *Shaw*, 37 S.W.3d at 903.

We disagree with the State's argument that Clark's testimony meets the standard of corroboration proof set forth in our supreme court's opinion in *Shaw*. Taken in the light most favorable to the State, Clark established that a man who was not Woods or Smith, and who was shorter than Woods, Smith, and the victim, shot the victim. *Shaw* requires that the corroborative testimony must both *implicate* the *defendant* and also *identify* the *defendant*. Clark's testimony implicated an unknown and unidentified third person as the shooter. As to witnesses who were present at the time of the crime, only the accomplices implicated and identified Defendant.

The State additionally argues that proof of details concerning how the offense occurred, that Defendant was a gang member, and that a deep scalp contusion to the

victim's head that was consistent with the victim being kicked in the head corroborated the accomplice testimony. It is correct that these examples corroborated portions of the accomplice testimony. Again, in order to meet the test of *Shaw*, the corroborative testimony must provide some direct or circumstantial evidence both implicating and identifying Defendant in the criminal act. *Shaw*, 37 S.W.3d at 903 (quoting *Bigbee*, 885 S.W.2d at 803).

While certainly not overwhelming, we do agree with the State's argument of corroboration evidence as to the recorded phone call Defendant made from the jail to his mother on March 18, 2016, a few days after he was arrested and four days after he had given a statement to Investigator Long. In that call, he told his mother to contact Red, his female "associate" (with whom he admitted having been intimate), to maybe help him out in the case. Defendant told his mother he had gone to Red's house on the night of the murder and had spent the night there.

Four days before this phone call, Defendant had told Investigator Long that on the night of the murder, he had gone to church with his grandmother *and* his mother and returned to his home with his grandmother after church. At trial, Defendant testified that he had lied in the phone conversation with his mother and that he had actually gone to church and then home with his grandmother. He explained that he lied to avoid having his mother blame his grandmother for causing him to be in trouble.

The jury judged the credibility of Investigator Long and Defendant. The jury could reasonably believe that Defendant lied to Investigator Long in his statement on March 14, told his mother the truth in the phone call, and lied on this matter at trial. The jury could reasonably conclude that asking his mother to contact "Red" so she could help Defendant might have been an effort to manufacture an alibi. The jury could further conclude that Defendant's untruthfulness was evidence of Defendant's knowledge of his guilt. Woods testified that he took the shooter (Defendant) to Red's home directly after the victim was murdered. Defendant's statement in a phone conversation with his mother, and his rather questionable testimony explaining why he purportedly lied to his mother, is circumstantial evidence of Defendant's identity as the shooter and which implicates him in the victim's death. Since this proof "fairly and legitimately tends to connect [Defendant] with the commission of the [murder]," *Shaw*, 37 S.W.3d at 903, it provides sufficient corroboration of the accomplice testimony. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant contends that his sentence is excessive and that the trial court did not properly consider mitigating circumstances. The State responds that the trial court

imposed a within-range sentence that reflected a proper application of the purposes and principles of sentencing.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987); *see* T.C.A. § 40-35-102.

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

Defendant was convicted by the jury of second degree murder, a Class A felony, which carries a sentencing range of 15 to 25 years' imprisonment. T.C.A. § 39-13-210(c); T.C.A. § 40-35-112(a)(1). Defendant was sentenced as a Range I standard offender to 24 years' incarceration.

In sentencing Defendant, the trial court stated that it considered the evidence presented at trial and at the sentencing hearing, the presentence report, the principles of sentencing, arguments of counsel, the nature and characteristics of the criminal conduct involved, and the applicable enhancement and mitigating factors. The trial court found that the circumstances surrounding the commission of the offense were aggravated. Specifically, the trial court noted that Defendant shot the victim "eight or nine times" and then "kicked [the victim] in the head after he was on the ground." The trial court acknowledged that the sentence imposed was at the "high" end of the appropriate sentencing range. The trial court stated:

I know that's high.    But I did have the opportunity to observe [Defendant] during the trial of this matter and his testimony on two separate occasions now, and I – he does show no remorse.   He doesn't seem to care what happens.

And in this particular case, this – this crime was – to shoot a man nine times and then kick him in the head after he's down, it shows a disregard for being a part of society.

Regarding enhancement factors, the trial court found that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; that Defendant was a leader in the commission of an offense involving two or more criminal actors; that Defendant had previously failed to comply with the conditions of a sentence involving release into the community; that Defendant possessed or employed a firearm during the commission of the offense; that Defendant had no hesitation about committing a crime when the risk to human life was high; and that Defendant was on probation at the time the felony offense was committed.  *See* T.C.A. § 40-35-114(1), (2), (8), (9), (10), and (13)(C).   The trial court found no applicable mitigating factors.

The trial court's reliance on enhancement or mitigating factors are advisory only, and the trial court properly found that enhancement factors applied to Defendant's conviction.   The trial court did not abuse its discretion by enhancing Defendant's sentence within the appropriate statutory range or by declining to apply mitigating factors. *See Bise*, 380 S.W.3d at 706.  Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the facts and applicable case law, we affirm the trial court's judgment.

_____
THOMAS T. WOODALL, JUDGE