IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 8, 2020 Session

**STATE OF TENNESSEE v. BOBBY JOE PATRICK**

**Appeal from the Circuit Court for Grundy County**
**No. 5445     Thomas W. Graham, Judge**

_____

**No. M2019-02026-CCA-R3-CD**

_____

A Grundy County jury convicted the Defendant, Bobby Joe Patrick, of two counts of rape of a child, and the trial court sentenced him to a total effective sentence of sixty-seven years. On appeal, the Defendant contends that the trial court erred when it allowed the State to introduce evidence of prior bad acts that should have been excluded pursuant to Tennessee Rule of Evidence 404(b). The Defendant also contends that the trial court erred when it instructed the jury on "generic evidence." After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

B. Jeffery Harmon, District Public Defender; Robert G. Morgan, Assistant Public Defender, Jasper, Tennessee (at trial); J. Alex Little and Zachary C. Lawson, Nashville, Tennessee (on appeal), for the appellant, Bobby Joe Patrick.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; J. Michael Taylor, District Attorney General; David Owen McGovern and David L. Shinn, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Background and Facts**

This case arises from the Defendant sexually abusing the victim, his seven-year-old step-daughter, in a home he shared with the victim's mother. For these offenses, a Grundy County grand jury indicted the Defendant for two counts of rape of a child and two counts

of aggravated sexual battery.

## A. **Motion in Limine**

Prior to trial, the State filed a motion seeking to introduce evidence of the Defendant's prior bad acts pursuant to Tennessee Rule of Evidence 404(b). Specifically, the State sought to introduce evidence that the Defendant had threatened the victim and her mother with physical harm to show why the victim had delayed reporting the abuse. The trial court held a hearing on the motion, during which the following evidence was presented: Jennifer Bellamy testified that she was employed as a family advocate at the Coffee County Children's Advocacy Center and was responsible for conducting forensic interviews at the Center. Ms. Bellamy testified that she interviewed the victim in 2012 and described her as talkative but scared. Ms. Bellamy recalled that the victim told Ms. Bellamy that she was scared that the Defendant would be released from jail and kill her. The victim reported not sleeping well because she was afraid that the Defendant would come through her bedroom window. The victim was holding a "security blanket" throughout the interview, which she reported was for her protection. The victim was nine-years-old at the time of the interview.

The victim reported to Ms. Bellamy that the Defendant would abuse her when the victim spent the night at the Defendant's house, which he shared with the victim's mother. She stated that the abuse occurred during the night while the victim's mother worked the night shift at a local restaurant. The victim described the events as happening while they were "living in the projects in Tracy City" and that the abuse began when she was five years old.

In response to questioning by the trial court, Ms. Bellamy testified that, based on her experience, the victim's disclosure seemed credible. The defense questioned Ms. Bellamy about the victim's timeline of the abuse, telling Ms. Bellamy that the victim's mother did not have a job at the local restaurant until the victim was seven years old. Ms. Bellamy testified that this fact did not change her judgment of the victim's credibility because the victim did not make any statements about when the Defendant's abuse ended. Ms. Bellamy's understanding of the victim's statements was that the abuse ended when the victim's mother stopped working at night.

The victim testified that she was thirteen years old at the time of the hearing and that she remembered her interview with Ms. Bellamy. At the time of the 2012 interview, the victim was in the fourth grade at Monteagle Elementary. The victim testified that, the morning of the hearing, she had watched the recording of her 2012 forensic interview. She explained that she had gotten "mixed up" during the interview when she told Ms. Bellamy that the Defendant had begun sexually abusing her when she was five years old. The

2

victim testified that she meant that the Defendant had begun "whipping" her when she was five but that the Defendant began touching her sexually when she was seven.

On cross-examination, the victim stated that she realized the mistake in the timeline when she watched the recording on the morning of the hearing. The victim testified that she was living with her aunt while the abuse was occurring, and her mother was living with the Defendant and working the night shift. Along with her mother and the Defendant, her half-brother and half-sister lived in the house as well. The victim went to their house every weekend and slept in the same room as her half-siblings. While they slept and her mother was at work, the Defendant would abuse her. The victim testified that she did not report the abuse because she was scared. The victim tried to "hint" to her aunt what was happening but her aunt "didn't get it."

The victim testified that she saw a "Kids on the Block" program at her school that caused her to remember what happened. The victim "tried to forget" what the Defendant had done. When she learned from her mother that the Defendant was in jail, the victim told her teacher what had happened. The victim testified that the abuse had occurred three or four times.

On redirect-examination, the victim clarified that she made the mistake of reporting that the abuse occurred when she was five years old during the forensic interview; every other time she spoke about the abuse, she reported it occurring at seven years old. The victim clarified that "Kids on the Block" is a puppet show about "good touching or bad touching," and that when she watched it, she got really sad and upset.

The State informed the trial court that the forensic interview recording contained statements made by the victim about the Defendant pulling a gun on her and her mother and statements about the Defendant threatening to take them out of the country, which the victim had reported caused her to be fearful of the Defendant. The State wanted these statements admitted as evidence of the victim's state of mind and how they, making her fearful of the Defendant, caused her to wait two years to report the Defendant's abuse.

At this point, the trial court briefly heard arguments from both parties about the admissibility of the recording and reserved a ruling following the trial court's viewing of the recording. After viewing the recording, the trial court issued an order allowing "certain video evidence" from the recording to be admitted. In its order, the trial court found (as relevant):

> Jennifer Bellamy meets the qualifications for a forensics interviewer as set forth by T.C.A. § 24-7-123(b)(3).

3

The video statement [made by the victim] possesses particularized guarantees of trustworthiness following the Court's review of the relevant factors set forth in T.C.A. § 24-7-123(2).

The video interview should terminate at the 10:33 point since the remainder of the interview contains questions and discussions about the Defendant's drug usage and selling habits which are not relevant to the issue of rape of a child as set forth in this case. Even if this information was determined to be marginally relevant, its prejudicial value should outweigh the probative value.

The trial court ordered the video recording to be placed under seal at the conclusion of trial.

## B. Trial

Before trial but after the jury was empaneled, the State moved to dismiss the two counts of aggravated sexual battery. The State then addressed the Defendant's 404(b) motion to exclude statements made by the victim in the forensic interview recording, specifically instances of physical abuse and threats she received from the Defendant. The trial court reiterated its ruling from the prior hearing that allowed for a portion of the recording to be admitted but redacted mention of the Defendant's drug abuse and other habits. The Defendant raised the issue of his possible objection to the forensic medical examiner who evaluated the victim, and the trial court reserved a ruling on the matter of the examiner's technical qualifications, pending her testimony.

The following evidence was presented at the Defendant's trial: Vicki Shook, testified that she was the victim's fourth grade teacher in 2012. She recalled that in November of 2012, a puppet show called "Kids on the Block," which addressed the subject of child sexual abuse and physical abuse, came to the victim's elementary school. After seeing the show, the victim came to Ms. Shook in the classroom and said she needed to see the school counselor. The victim was crying and shaking and said, "This happened to me." Ms. Shook took the victim to the principal's office where she, the principal, and the school counselor met with the victim "at length." Ms. Shook described the victim as inconsolable and scared. The victim told the counselor that "this" had happened while her mother was at work. The counselor asked the victim if somebody had touched her, and the victim reported that her mother's boyfriend had touched her. The victim said "it" happened while her mother was at work and the victim was asleep. The victim said the Defendant would get in bed with her and touch her. Ms. Shook described the victim as "uncontrollable," and, when the school counselor tried to calm the victim, the victim said that they could not tell anyone and that the Defendant had told her not to tell anyone. The victim said that she was afraid for her siblings. The counselor notified the victim's

4

guardian, her great aunt, who retrieved the victim from school.

Deputy Robin McNeese testified that she was employed by the Grundy County Sheriff's Department and had investigated the victim's allegations. Deputy McNeese arranged for the victim to be interviewed at the Child Advocacy Center and was present when Ms. Bellamy interviewed the victim. After observing the interview in a separate room, Deputy McNeese interviewed the victim's mother, the victim's aunt, and the elementary school counselor, all in an effort to corroborate the victim's statements in the interview.

Jennifer Bellamy testified to her background, employment, and credentials, consistent with her testimony in the prior hearing. Ms. Bellamy testified that she had interviewed the victim in November 2012 and had watched the recording of the interview prior to trial. The recording was played for the jury and was stopped at the time consistent with the trial court's order in the motion in limine. In the interview, which was admitted as an exhibit, the victim told Ms. Bellamy, specifically, that the Defendant had done "bad things" to her. The victim said that these "things" stopped when her mother stopped working the night shift. The victim described the Defendant as touching her in her "bad areas" "real hard." The victim recalled waking up in the night and finding the Defendant touching her but then he pretended to be asleep. She reported that he took off her underwear "sometimes." The victim stated that the Defendant was moving his finger around in her "private" and that he "put his private" "inside" her "butt." All this occurred during the "night times." When asked "how" the Defendant touched her, she stated that the Defendant put his hand inside her and pushed hard, hurting her. The victim "believed" that the Defendant "put" his "private" "to" her butt. She stated that he did all this underneath her clothing or skin to skin.

Lori Littrell, qualified as an expert in forensic examination, testified that she performed a forensic medical evaluation of the victim in November 2012. She did not find any physical injuries on the victim.

Derryl Graham, the director of the Grundy County Housing Authority, identified a lease signed by the victim's mother, which also listed the Defendant, the victim, and two other children as living in an apartment in Tracy City. The Defendant was listed on the lease as the victim's mother's husband.

Joanna Ladd testified that she was the victim's aunt and that she had "raised" the victim for much of her life. She gained custody of the victim in 2009, when the victim was in first grade. Ms. Ladd testified that the victim's mother worked the night shift at a local diner and that the victim would visit her mother on weekends at the residence she shared with the Defendant and their two children. At some point in the spring of 2010,

5

Ms. Ladd stopped the victim from spending the night there because the victim returned home with marks on her legs. Ms. Ladd advised the victim's mother that her visitation with the victim would be under Ms. Ladd's supervision only. Ms. Ladd testified that, on some occasions when the victim returned home from staying with her mother and the Defendant, the victim would complain of pain in her bottom. Ms. Ladd recalled that the victim's vagina was sometimes "red, raw," and that Ms. Ladd would treat it with topical ointment. Ms. Ladd testified that she did not suspect that the victim had suffered sexual abuse. Ms. Ladd recalled the phone call she received from the victim's school in 2012, telling her that the victim had reported being sexually abused. Ms. Ladd described the victim as "hysterical" and "hyper-ventilating" and "inconsolable" when Ms. Ladd retrieved her from school. Ms. Ladd recalled that, during the time the victim was staying with her mother and the Defendant, the victim was diagnosed with "a whole lot" of urinary tract infections.

On cross-examination, Ms. Ladd testified that she knew the Defendant well and that she had concerns about the Defendant caring for the victim. She explained that she argued with the Defendant about putting the victim in a car seat and also that she suspected the Defendant of drug use. Ms. Ladd stated that the marks on the victim concerned her, and she told the victim's mother that she would not allow the victim to return to their house. The victim reported the Defendant as being "hateful and ugly," but never reported physical abuse.

At this point, outside the presence of the jury, the State requested permission to further question Ms. Ladd about the Defendant, based on the defense opening the door on cross-examination about Ms. Ladd's issues with the Defendant. The trial court stated that it would not allow the State to question Ms. Ladd further, stating that the issue of Ms. Ladd's dislike of the Defendant had been shown and that the point need not be further explored.

The victim testified that she had spent most of her fourteen-year life living with Ms. Ladd. She recalled visiting her mom and the Defendant at their home and the puppet show at her school. The victim agreed that she had originally reported the "assaults" occurred when she was five or six years old. She clarified that those disclosures were referring to the Defendant "hitting [her] and stuff." The victim testified that, when she was older, around seven years old, the Defendant started touching her in a "bad" way. The victim testified that the "bad touches" occurred when the Defendant touched her "in [her] private part" and on her breasts. The victim recalled waking up in her mother's bedroom, where she slept, because something was "really hurting" and the Defendant's finger was inside her vagina. She testified that her siblings would be in the bed with her when this occurred. The Defendant pretended to be asleep. The victim stated that her mother was at work when this happened.

6

The victim testified that, on other occasions, the Defendant would touch her private area but not insert his fingers. She testified that he touched her about three or four times and that the touching always occurred in the bedroom. The victim stated that she did not know why she waited two years to report the abuse but stated that she was scared of the Defendant.

The victim testified that she was afraid because the Defendant "used to hold a gun to" the victim and her mother and her siblings; the Defendant also used to threaten her mother, and he told them that he would take the victim and her mother somewhere that no one could find them, like Mexico. The victim recalled telling Ms. Bellamy, in her interview, that the Defendant had attempted to anally penetrate her with his penis; she reiterated that this statement was true and testified that it had occurred one time. She testified that the attempted anal penetration occurred the second or third time that the Defendant had touched her sexually. The victim said "[His penis] like really wouldn't go in, but I guess like he tried." The victim testified that she felt the Defendant's penis try to penetrate her anally. When asked if his penis "just didn't go all the way in?," she replied no.

Following the close of the State's evidence, and outside the presence of the jury, the State elected, for Count 1, the first incident described by the victim when she woke up and felt the Defendant digitally penetrating her vagina. For Count 2, the State elected the generic evidence of the victim's testimony regarding the remaining touching incidents. The Defendant objected, stating that there was insufficient evidence of "any penetration the other times" and "no penetration anally." The Defendant argued that the trial court should issue a directed verdict on Count 2. The trial court responded that the victim had testified to the Defendant touching her anal area with his penis, sufficient for a jury to convict him of anal penetration, however slight. The trial court went on to clarify that regardless of that point, Count 2 was not limited to the anal touching described by the victim, stating that the victim's testimony was that additional touching, beyond that elected for Count 1, had occurred "two or three other times." Based on this, the trial court overruled the objection.

The victim's mother ("the mother") testified that she had been married to the Defendant with whom she shared two children. She testified that she had lost custody of her children at one point, which was when Ms. Ladd took in the victim to live with her. The mother referred to losing custody based on her not being able to pass a drug test. The mother agreed that Ms. Ladd and the Defendant did not get along and that Ms. Ladd expressed her dissatisfaction with the Defendant's and the mother's relationship.

The mother worked on a parenting plan in the spring of 2010 in the hopes of

regaining custody of her children. The Defendant was tasked with the same but the mother testified that he did not complete his parenting plan and did not pass a drug test, so the court told the mother to choose between her children and the Defendant. The Defendant visited with the children occasionally but they did not reside together. The mother testified that she began working at the local restaurant in February of 2010, just after she had regained custody of her children. She reiterated that she and the Defendant were not in a relationship at that point. She testified that she worked the night shift at the restaurant and used a female neighbor as a babysitter for her two younger children.

When asked, the mother could not recall specific times when the Defendant was left alone with her children. The mother testified that the victim's biological father stayed with them a few times. The mother recalled that, when the Defendant was living with her, he was responsible for disciplining the children, which included spanking the victim. The mother recalled that the victim visited her grandmother in Ohio for several weeks in July of 2010. When the victim returned, she had "melt down[s]" and was sometimes hysterical, so they enrolled the victim in counseling. The mother denied that the victim had ever had marks on her legs. When asked about an incident with the Defendant brandishing a gun, the mother said that it happened right after the Defendant's brother had died in a car wreck and his mother had gone to jail. She said the Defendant had a shotgun and was threatening to kill himself.

On cross-examination, the mother agreed that she remembered getting a call in 2012 from Ms. Ladd pertaining to the victim's disclosure at school following the puppet show about child sexual abuse. The mother did not see the victim for a few days but accompanied her and Ms. Ladd to the Child Advocacy Center. The mother testified that she watched the victim's interview with Ms. Bellamy but stated that she was too hysterical to pay attention to what the victim was saying.

The mother clarified that she lost custody of her children in August of 2009, during which time the Defendant was living with her, because four "pot roaches" were found in their shared unit. At that point, the mother agreed to give Ms. Ladd temporary custody of the victim while her other children were placed in foster care. The mother agreed that the victim had been "whooped" on her behind a couple of times but that the mother would not let someone beat her child.

When asked about her interview with Deputy McNeese, the mother could not recall saying that there had been two gun incidents involving the Defendant. The mother denied that the Defendant had ever threatened her or the victim about taking them out of the country. She did not remember telling Deputy McNeese that he threatened to take them to Mexico. The mother agreed that she told Deputy McNeese that the Defendant hit her with a gun but that the victim had not been present for the incident. The mother continued

8

to answer questions about her statement to Deputy McNeese; some of her statements she was able to remember, some she was not. As the State continued to ask the mother about her statement from the interview with Deputy McNeese, the Defendant objected to the relevance of the line of questioning and the trial court stated that the State had the right to question the mother about the inconsistencies between her statement to Deputy McNeese and her testimony. The Defendant argued that the entire line of questioning sought to paint the Defendant in a bad light. The trial court instructed the State to refrain from questioning the mother about every single inconsistent statement, stating that it would allow some leeway because of the nature of cross-examination but to "wrap [] up" this line of questioning.

The Defendant testified and denied that, other than "whippings," he had ever touched the victim or injured her. On cross-examination, the Defendant agreed that the victim came over on weekends while he was living with the mother and their other children. He testified that the mother obtained residence in Tracy City in order to "get the kids back," referring to his and the mother's loss of custody of their children. The Defendant agreed that the mother had a job at a local restaurant and worked the night shift. The Defendant stated that he and the mother had to be drug tested to regain custody of their children; the Defendant also made reference to being on pain pills and said that he probably did not need to be around children at that time.

The Defendant agreed that, when the children stayed at the residence leased by himself and the mother, they all stayed in the same bed and often with the Defendant in the bed. The Defendant could not recall if the victim slept with them and had trouble remembering much of the timeline surrounding these events. He agreed that he first heard of the victim's allegations of sexual assault while he was in jail. The Defendant reiterated his denial of touching the victim and said he thought of her as his own daughter. He denied threatening her or making any statements about taking the victim out of the country.

Based on this evidence, the jury convicted the Defendant of two counts of rape of a child. The trial court held a sentencing hearing and imposed a thirty-two-year and thirty-five-year sentence for each of the rape of a child convictions to be served consecutively, for a total effective sentence of sixty-seven years of incarceration. It is from these judgments that the Defendant now appeals.

## II. Analysis
### A. 404(b) Evidence

On appeal, the Defendant asserts that the trial court improperly admitted statements by the victim in her forensic interview and testimony about the Defendant's behavior and conduct in violation of Tennessee Rule of Evidence 404(b), which prohibits the admission

of evidence of, as applicable here, bad acts by the defendant to show bad character and action in conformity with that trait. The State responds that the evidence was admitted for several non-propensity purposes and thus was not erroneously admitted. We agree with the State.

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

"Evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person in order to show action in conformity with that character trait. Tenn. R. Evid. 404(b). Such evidence may be admissible, however, for "other purposes." *Id.* Our Supreme Court has determined that such "other purposes" include demonstrating motive or intent. *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). Such evidence is admissible for other purposes, provided that the trial court: (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on evidence of prior crimes, wrongs, or acts. *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002). When a trial court substantially complies with the procedural requirements of Rule 404(b), the standard of appellate review of the trial court's decision is abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *James*, 81 S.W.3d at 759. If the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

We begin by addressing the parties' arguments regarding our standard of review as it pertains to the admission of evidence pursuant to Tennessee Rule of Evidence 404(b). The Defendant contends that our standard of review is *de novo* because the trial court

"ignored" the procedures required to admit evidence of the Defendant's prior crimes or bad acts and "failed entirely" to make the rulings required of it by Rule 404(b). *DuBose*, 953 S.W.2d at 652 (stating that "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements" of Rule 404(b)). The State responds that the trial court properly held a hearing on the statements made in the video recording and allowed them to be admitted pursuant to a proper requisite weighing of the prejudicial versus probative value of the evidence. The trial court's weighing of the evidence, the State contends, extended to the admission of testimony at trial which sought to establish or rebut the same point: that the victim was afraid of the Defendant and thus delayed her disclosure. Thus, the State contends that our standard of review should be an abuse of discretion. *Id.* (applying abuse of discretion standard when trial court substantially complies with the procedural requirements of Rule 404(b)(1)-(4)).

The trial court held a hearing prior to trial and heard testimony from the victim and the forensic interviewer, Ms. Bellamy. After the hearing and viewing the recording of the forensic interview Ms. Bellamy conducted, the trial court issued an order stating that the recorded interview itself possessed the "guarantees of trustworthiness" and that the victim's statements provided context around the years-long delay in her disclosure of the sexual abuse. The trial court further found that this evidence of the victim's fear of the Defendant was relevant specifically to show the victim's state of mind. The trial court explicitly stated that the statements in the interview were not unfairly prejudicial to the Defendant. The trial court did find, however, that a portion of the recording contained statements about the Defendant's drug use and other habits, which the trial court deemed were inadmissible pursuant to Rule 404(b), because the evidence was unfairly prejudicial and outweighed any probative value. It ordered a portion of the interview redacted and reminded the State several times of the limitation of what could be shown to the jury.

We note that the State concedes that the trial court did not "perfectly" comply with the safeguards of Rule 404(b), while the Defendant argues that the trial court completely failed to do so. In our view, based on what transpired at the pre-trial hearing and what was contained in the trial court's order, the trial court substantially complied with the requirements for admitting evidence pursuant to Rule 404(b), sufficient to warrant our review based on the abuse of discretion standard.

In light of this, we turn to the particular items of evidence complained of by the Defendant to determine whether the trial court abused its discretion when it allowed them to be admitted. Specifically, the Defendant complains of statements made by the victim in the forensic interview, and testimony throughout trial, about the Defendant's wielding a gun, hitting the victim's mother with a gun, losing custody of his children, his physical discipline of the victim, and his alleged threat made to the victim and her mother about taking them out of the country. The Defendant argues that this evidence was only

11

presented to paint the Defendant in a negative light as a violent man or a bad parent.   The Defendant concedes that in some cases a victim's fear might be a necessary topic to present to the jury.

The trial court reviewed the statements made in the video and concluded that they provided context as to a material issue: why the victim waited two or more years to make her disclosure about the sexual abuse.   We conclude that, in this case, the victim's fear of the Defendant and her delay in reporting was proper background evidence that would not have confused the jury on the material issue of whether the victim was raped and why she waited two or more years to disclose the incidents.   The fact that the evidence specifically spoke to the Defendant's violent nature or parental fitness does not make it inadmissible. *See State v. Gilliland,* 22 S.W.3d 266, 271 (Tenn. 2000) (evidence offered to show contextual background need not be excluded simply for the reason that it involves evidence of prior acts.   If the contextual evidence is relevant to an issue other than criminal propensity and its probative value is not outweighed by the danger of unfair prejudice, then that evidence may be properly admissible.)   The trial court did not abuse its discretion when, after making a finding that the video itself was trustworthy and, pursuant to a weighing of its probative value, redacting the irrelevant or prejudicial portions of it, it allowed evidence of the victim's fear of the Defendant to be admitted.

As to the testimony at trial regarding the Defendant's prior acts, we conclude the trial court did not abuse its discretion when it allowed the evidence to be admitted.   We would point out first that the Defendant failed to make contemporaneous objections to the testimony regarding the litany of evidence he now contends was erroneously admitted.   In addition to the victim and Ms. Ladd, the Defendant himself and witnesses testifying on his behalf referred to him physically disciplining the victim, his losing custody of the children, his failing to regain custody because of his drug use, his use of a gun, etc.   The Defendant and other witnesses also denied that certain events occurred, such as him threatening to take the victim out of the country, or the witnesses simply could not recall what had happened.   The trial court allowed the Defendant ample leeway to contest these prior acts, which he did by way of multiple witnesses.   Thus, we conclude that the trial court did not abuse its discretion when it allowed testimony from both the State's witnesses and the Defendant's regarding these prior acts.   The Defendant is not entitled to relief as to this issue.

## B. Jury Instruction

The Defendant contends that the trial court erred when it instructed the jury regarding "generic evidence" because the evidence did not support the instruction, as the State's evidence consisted of two specific incidents of child rape and not a generalized pattern of rape.   He contends that his conviction in Count 2 for rape of a child should be

vacated. The Defendant further contends that, even if giving the instruction was appropriate, the trial court erred by providing "the wrong rules for applying it," as evidenced by a question posed by the jury during the deliberations. The State responds that the victim gave accounts of multiple instances of rape but could not, related to Count 2, specifically recall the incident or date of the incident, necessitating the generic evidence instruction. The State further argues that any error in the trial court's instructions was "unquestionably harmless."

A trial court has the duty to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the trial court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)).

Generally, the right to a trial by jury guarantees that a verdict rests on the jurors' unanimous conclusion that the defendant committed one particular criminal act. *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001). Accordingly, when evidence of multiple instances of unlawful sexual contact is introduced, the State must elect the specific conduct which forms the basis of the conviction. *State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015). The election requirement enables a defendant to prepare for trial, protects against double jeopardy, and allows the trial and appellate court to review the sufficiency of the evidence. *Kendrick*, 38 S.W.3d at 568. In the sex crimes context, the general prohibition of evidence relating to other crimes or bad acts is relaxed, especially where the defendant is alleged to have committed sexual offenses over a lengthy period of time against young children. *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016) (citing *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001); *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994); *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993)). The State is not required to identify the particular date that the offense occurred because the time of an offense is immaterial to bringing the indictment and because in cases involving young children, such as the one at bar, the victim may not be able to pinpoint the exact timing of the abuse. *Shelton*, 851 S.W.2d at 137. Instead, the State may elect to identify a particular type of abuse or may base the election on "unique surroundings or circumstances that help to identify an incident." *Id.* at 138. The circumstances might include reference to a meaningful date or event such as a birthday, but "[a]ny description that will identify the prosecuted offense for

13

the jury is sufficient." *Id.* When the victim is only able to give "generic evidence" of a pattern of repeated abuse without differentiating the instances of abuse, the jury should receive a modified unanimity instruction which instructs the jury that it must unanimously agree that the defendant committed all acts described by the victim. *Qualls*, 482 S.W.3d at 17. This approach does not, however, apply "[w]here the prosecution presents non-generic evidence of distinguishable criminal acts." *Id.* at 16. Because questions regarding the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

The proof in this case established that the victim spent the night at her mother's house under the Defendant's care, beginning February of 2010, when the victim's mother began working the night shift. This arrangement continued until the spring of 2010 when the victim's aunt ceased to allow the victim to spend the night. The victim testified that, during this time period when she spent the night on weekends and while her mother was at work at night, the Defendant touched her "in" her vagina while she slept in a bedroom with her siblings. The State elected to submit to the jury as a basis for the conviction the digital vaginal penetration which occurred in the bedroom. The victim further testified that the Defendant touched her similarly three or four times without inserting his fingers, and one time he attempted to anally penetrate her with his penis but his penis "didn't go all the way in;" however, during the video recorded interview shown to the jury, the victim reported that the Defendant put his "private" "inside" her "butt."

The Defendant argues that the State presented two specific instances of rape: a single incident of digital penetration and a single incident of anal penetration and thus no "generalized" evidence existed to warrant a generic evidence instruction; the Defendant, however, acknowledges that the victim "mention[ed]" "three or four" instances of touching. The State properly elected one of the distinct offenses supported by the victim's testimony that the Defendant digitally penetrated her vagina. Beyond that, the State sought a conviction for a second count of rape based on the other "three or four" instances of touching or the attempted anal penetration.

We conclude that the evidence presented at trial warranted the jury instruction of "generic evidence" for Count 2. The victim's testimony was that, during a general time period of the abuse in 2010, the Defendant touched her vagina and put his penis in her anal area and attempted to anally penetrate her. She stated that it occurred multiple times without providing a date. This testimony evidences the necessity of the instruction, and, in such a case, a "jury *should* receive a modified unanimity instruction which instructs the jury that it must unanimously agree that the defendant committed all acts described by the victim." *See Qualls*, 482 S.W.3d at 17 (emphasis added).

14

We note that the victim's testimony about the attempted anal penetration, where she testified that the Defendant "tried" to penetrate her but was not successful was, in our view, sufficient evidence from which the jury could infer that the Defendant penetrated her anus, at least slightly, with his penis. "The occurrence of penetration, even though penetration is statutorily defined, is a question of fact." *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001). The *Bowles* court emphasized that penetration could be established by proof of even the slightest intrusion. *Id.* In addition, this court has held the proof of penetration sufficient "even without evidence of full . . . intrusion of the victim's anal opening." *State v. Charles L. Williams*, No. M2005-00836-CCA-R3-CD, slip op. at 16 (Tenn. Crim. App., Nashville, Nov. 29, 2006). We have also deemed the evidence of penetration sufficient where the victim "testified that the defendant's penis had touched the inside of his 'butt' and that it was '[p]ainful.'" *State v. Ray Charles Gasaway*, No. 01C01-9703-CR-00101, 1998 WL 131536, at *2 (Tenn. Crim. App., Nashville, Mar. 24, 1998); *see also State v. Albert L. Schlief*, No. E2008-02147-CCA-R3-CD, 2010 WL 908469, slip op. at 15-16 (Tenn. Crim. App. Mar. 15, 2010) (concluding that there was sufficient proof of penetration "based upon the victim's testimony that the defendant "'tried to put his wiener in [her] butt,'" that his penis did not "enter [her] body," that she could tell that the accused was trying to penetrate her anus with his penis "'[b]ecause [she] felt him . . . [o]n [her] butt,'" and that the action was "'[u]ncomfortable.'")

We reach the same conclusion about the victim's testimony regarding the instances of vaginal touching, other than the one elected for Count 1. The victim initially testified that the "bad touches" occurred when the Defendant touched her "*in* [her] private part" and on her breasts. (emphasis added). Later in her testimony, she referred to this same "touching" as happening three or four times. Vaginal penetration, which is an element of rape of a child, does not require "that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient." *Bowles*, 52 S.W.3d at 74 (Tenn. 2001). Our supreme court and this court have upheld rape convictions based upon testimony analogous to the victim's testimony in this instance where he "touched" her "private area." *See id.* (finding sufficient evidence of penetration based on the victim's testimony that the defendant had "pressed his penis against her vulva with his hand"); *State v. James R. Troxell*, No. E2012-00233-CCA-R3-CD, 2012 WL 3642821, at *3 (Tenn. Crim. App. Aug. 27, 2012) (finding sufficient evidence of penetration based on the victim's testimony "that the defendant placed his fingers on her vagina and rubbed her vaginal area"); *State v. Willie Earl Brown, Jr.*, No. M2009-00505-CCA-R3-CD, 2010 WL 4396490, at *10 (Tenn. Crim. App. Nov. 5, 2010) (finding sufficient evidence of penetration based on the victim's testimony that the defendant had "put [a] vibrator on her . . . clitoris"); *State v. Adrian Crane*, No. W2000-01892-CCA-R3-CD, 2001 WL 912798, at *2 (Tenn. Crim. App. Aug. 9, 2001) (finding sufficient evidence of penetration where the defendant "admitted [to] 'playing' with [the victim's] vagina with his penis, but denied placing his penis inside the victim's vagina").

15

As for the Defendant's contention that the trial court gave the jury the "wrong rules" for applying the generic evidence instruction, we have reviewed the trial court's response to the jury's question, regarding the generic evidence to support Count 2, which the Defendant specifically takes issue with. The jury's question was: "When referring to additional incident, . . . do we need to consider more than the 'bottom'?" The trial court responded:

Ladies and gentleman, I know Count [2] is a little difficult to fully understand, . . . and I hope this will help you.

You sent out the question, When referring to additional incidents do you need to consider more than the bottom, meaning anal penetration that's one form of . . . child rape.

And my response to this is: You must consider all child rape allegations made by the victim other than the first digital penetration, which is the specific charge [for Count 1]. So if you find any other allegations of child rape by the victim, they are the generic charges for consideration in Count [2] only. So the answer is the bottom, anal penetration is not necessarily the only form of child rape you need to consider in Count [2].

So there's two steps here. You have to decide whether an allegation of child rape was even made. If she made the allegation and it's general in nature, then you consider whether or not you believe that allegation is supported beyond a reasonable doubt in your thinking about credibility and all the things that you have to do.

The Defendant contends that this response is "a mess." We disagree. In our view, these instructions are clear, as well as consistent to the initial charge to the jury regarding the "generic evidence" which we have concluded was proper. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE